No. 32.—BRIGGS H. MOULTRIE, *et al.* plaintiffs in error, *vs.* ROBERT B. SMILEY, defendant.   B. H. MOULTRIE *vs.* JOHN NEAL.

[1.] The 8th rule of the Act of Incorporation of the Commercial Bank of Macon provides, that the debts which the corporation shall at any time owe, shall not exceed three times the amount of the stock paid in, over and above the deposits in their vaults ; and that in case of excess, the directors under whose administration it shall happen, shall be liable for the same in their *individual, natural* and *private capacities,* in an action of debt to be

brought against them or any of them, their or *any of their heirs, executors or administrators,* in any Court of record in the United States, having competent jurisdiction of the subject, by any creditor of the corporation; and may be prosecuted to judgment and execution, any *condition, or covenant,* or agreement to the contrary, notwithstanding: *Held,* that an action brought, under this rule, against certain directors who were guilty of an over-issue, did not abate by the expiration of the charter, by its own limitation, during the pendency and before the termination of the suit: *Held, further,* that a creditor of the corporation, is entitled to recover only the amount of his debt or demand, and not the entire excess, *in solido.*

Debt, in Bibb Superior Court. Tried before Judge POWERS, November Term, 1854.

This was an action brought to January Term, 1848, by Robert B. Smiley, against Briggs H. Moultrie, Charles Campbell, William B. Johnston and Thaddeus G. Holt. The declaration set out, that the defendants, on the 29th of Sept. 1847, were the directors, and the sole directors, of the Commercial Bank of Macon; that at that date, and from thence continuously, up to the time of bringing this suit, the indebtedness of said bank exceeded three times the amount of the capital stock paid in, over and above the amount of moneys actually deposited in their vaults for safe-keeping; that said excess of indebtedness occurred during the administration of defendants, who have been, since that time, and still are, the directors as aforesaid; that the plaintiff, on said 29th Sept. 1847, was *bona fide* holder of certain bills of said bank, on which he obtained judgments against the bank, in a Justice's Court, on the 13th Nov. 1847, which he still holds unsatisfied.

The declaration further stated, that the aforesaid excess of indebtedness was, at the time it was created, and is, and has been continuously, over 300 dollars, and that returns of *nulla bona* as to said bank, had been regularly entered on his *fi. fas.* by the proper officer. Wherefore, he sought to hold the defendants personally liable for said debt, by virtue of the Statute incorporating said bank.

The 8th rule of the Act of Incorporation of the Commercial Bank of Macon is as follows:

Moultrie *et al. vs.* Smiley and Neal.

"The total amount of debts which the said corporation shall, at any time owe, whether by bond, bill, note, or other contract, shall not exceed three times the amount of their stock paid in, over and above the amount of moneys actually deposited in their vaults for safe keeping.  In case of excess the directors, under whose administration it shall happen, shall be liable for the same in their individual, natural, and private capacities; and an action of debt may, in such case, be brought against them or any of them, or any of their heirs, executors or administrators, in any Court of record in the United States having competent jurisdiction, or either of them, by any creditor or creditors of the said corporation, and may be prosecuted to judgment and execution, any condition, covenant or agreement to the contrary notwithstanding.  But this shall not exempt the said corporation, or the lands, tenements, goods and chattels of the same, from being also liable for, and chargeable with such excess, and such of the said directors, who may have been absent when the said excess was contracted or created, or who may have dissented from the resolution or act whereby the same was so contracted or created, shall be liable as other directors for said excess.   But such directors may be entitled to recover out of the directors assenting to such excess, by action of debt or on the case, the amount which they may have been compelled to pay".

The defendant filed plea of the general issue, and at May Term, 1852, he, by leave of the Court, filed the additional plea, that since the last continuance, to wit: on the 1st day of January, 1852, the time limited by the Act of Incorporation of the Commercial Bank of Macon, for the corporate existence of the same, terminated and expired, whereby the said corporation became extinct, and all debts and liabilities due to or from the said corporation became extinct also.

At November Term 1853, the cause being for trial and the Jury impannelled to try the same, plaintiff moved the Court to strike out the pleas of defendants, except the general issue, which motion was sustained and said plea ordered by the Court to be stricken out; which decision is alleged as error.

Plaintiff's Counsel then read in evidence the eighth rule of the charter of the Commercial Bank, and then offered in evidence the six Justice's Court *fi. fas. vs.* the Commercial Bank, specified in his said declaration; to the admission of which, Counsel for the defendants then and there objected, on the ground that the executions were no evidence of debt, but the judgment or bank bills must be produced; which objections were overruled by the Court, and said executions read in evidence, and Counsel for the defendants then and there excepted. And Counsel for the defendants further objected to the admission of said executions in evidence, because the suit should have been for the entire excess contemplated in the charter of the bank *in solido,* Counsel for the defendants admitting there was an excess of more than $1.000 of issue by the bank, as charged in the declaration, and up to the time of the commencement of the suit; and that the defendants were directors as charged.

Plaintiff closed, and defendants offering no evidence, the Court charged the Jury, that if they believed, from the evidence, that the defendants were directors, and that there was an excessive issue above plaintiff's demand, and above any prior payment or judgment for excess, they must find a verdict for the plaintiff for the amount of his demand, as proven, for principal debt, with legal interest thereon from the commencement of the suit, and ten per cent. damages; to which charge Counsel for the defendants excepted, and the Jury returned a verdict for the plaintiff for One Hundred and Eighty-nine Dollars and Eighty-three Cents principal, with interest from 7th December, 1848.   Defendants assign as error :

First. That the Court erred in sustaining the motion to strike defendant's pleas, as stated, on the ground that the charter of the bank expired before the suit was determined, and in ordering said plea to be stricken.

Second. That the Court erred in admitting in evidence the executions *vs.* the Commercial Bank, and in over-ruling the objection of Counsel to their admission, on the grounds that they were entitled to the judgments, and that the *fi. fas.* alone are

not evidence of debt, and because the suit should have been for the excess as stated in the charter.

3d. The Court erred in charging the Jury to find for the plaintiff the amount of his demand, as proven, for principal debt, with legal interest thereon, from the commencement of the suit and the ten per cent. damages.

TOOMBS, NISBET and JONES, for plaintiffs in error.

RUTHERFORD; WHITTLE, for defendant.

The Court not being unanimous, the opinions of the Judges were delivered *seriatim.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] As Counsel have addressed themselves almost exclusively to a single point in this case; and as it is the only one respecting which there is any contrariety of opinion between the members of the Court, I shall give to it the whole of my attention. It is this : Did the action of debt, brought against the directors, under the 8th rule of the Act of Incorporation of the Commercial Bank of Macon, abate by the expiration of the Charter, during the pendency, and before the termination of the suit ?

The important consequences which must necessarily flow from any decision made in this cause and other circumstances attending it, have induced me to re-examine, with more than ordinary care, the points heretofore decided by this Court, so far as they are again involved in the present issue ; as well as the arguments and authorities relied upon to controvert them.

With many, nay most of the propositions maintained by the learned and distinguished Counsel for the plaintiffs in error, I entirely concur.

I admit that all private charters are contracts—that it is the acceptance, express or implied, by the corporators, that gives force and validity to the Charter—that no one can be made a

corporator, without, much less against, his consent—that all contracts are supposed to be made in reference to the existing laws of the place where they are executed—and that these laws, when contracts are made, are incorporated with and form parts of them—that the charter of the Commercial Bank of Macon was a contract between the people of the State, through the Legislature on the one part, and the stockholders on the other —that the franchise granted, was the consideration for the obligations assumed—that the inhabitants of a municipal corporation are individually liable for the debts of the corporation— and that they are, nevertheless, saved by its dissolution.   These, and numerous other positions, stated and enforced with singular ability during this discussion, receive my hearty assent and approbation.

Moreover, I agree that the elementary writers, both in England and in the United States, do every where assert distinctly, that the debts due to and from a corporation, are extinguished by its dissolution, unless prevented by the terms of the charter itself, or by *aliunde* legislation; and that in the Courts of both countries, this doctrine may now be considered too        ettled to be overthrown or shaken, and so totally extinguished that the members of the corporation cannot recover  or be charged with them, in their natural capacities.

I deem it advisable to examine, at the outset, somewhat minutely, into the origin of this Common Law rule, not for the purpose of questioning its legality, but in order to restrict it in its application to the reason in which it is founded.   For *cessante ratione legis, cessat ipsa lex.*   And I feel fully warranted in this course, inasmuch as the rule itself has been justly characterized, by the most enlightened tribunals, as odious and iniquitous.   Said Mr. Justice *Clayton,* in delivering the opinion of the Supreme Court of Mississippi, in *Nevitt vs. Bank of Port Gibson,* (6 *S. & M.* 513):   " The almost universal prevalence of Statutes, in some shape or other, in the States of this Union, to guard against the consequences of dissolution, proves that they have their foundation deeply imbedded in an innate sense of justice.   And the condemnation of the Common Law rule,

by such men as *Kent, Gaston, Tucker,* and many others such · as they, shows that it is in utter hostility to the spirit of this . age. It belongs to the period when men, who could not pay their debts, were imprisoned for. life; and when the estates of ' criminals were confiscated to the government; and· it should be consigned to the same tomb with these antiquated barbarisms."

In support of the rule, Judge *Blackstone,* in his Commentaries, (1 *volume,* 484) quotes the case of *Edmunds vs. Brown and Sillard* (1 *Levinz,* 237.) Mr. *Barlow,* the author of the text of the treatise on Equity, commonly called by Mr. Fonblanque's . name, because he attached to it his valuable notes, states the · same principle in nearly the same language, and cites the same · case from *Levinz,* and no other. (1 *Fonbl. Eq.* 297.)

Now I am aware of the high authority of Sir *Cresswell Levinz,* as a Reporter. He not only had the commendation of ˙˙ Lords *Mansfield* and *Kenyon,* itself the highest praise, but per- · haps a still more satisfactory evidence of the value of his re- · ports is s'·-wn, by the demand for three editions; and their · frequent citation at the Bar and elsewhere. Besides, he reported th⟨ .. ⟩ions of that ablest of Judges and most upright of ' men, Sir *Matthew Hale,* who presided in the Courts of ·Westminster Hall at the close of the 17th and the beginning of the 18th centuries. Could I find the doctrine then broadly asserted in *Levinz,* I should be dumb—I should open not my mouth. But I must say, that no principle of equal magnitude ever rested on so frail a foundation.

What was the case of *Edmunds vs. Brown and Sillard?* It was an action of debt on an obligation of £500. The defendants pleaded *non est factum;* and on the evidence, it appeared ' that the defendants were two of the principal members of the Company of Woodmongers, then lately dissolved; and that. the money was borrowed in the name of the company, and the · obligation sealed in the name of the company, and with their · .seal. The defendants, as was usual, put their names to the obligation. But the obligation was "*noverint universi per* · *presentes nos magistrum et gurdianos,*" &c. *del company de·*·

*Woodmongers teneri, &c.;* and the obligation was endorsed *sigillat et deliberat in presentia, &c.* and attested.

The company being dissolved, the action was brought against the defendants, intending to charge them in their private capacities. But is was ruled that on the above state of facts, this could not be. On which the plaintiff was non-suited.

It is needless to suggest, by way of commentary, what will readily occur to every legal mind—that in an action of debt on the bond, on the plea of *non est factum,* this result was inevitable. The evidence showed that the corporation executed the bond, and not the individual members who sealed the obligation in the name of the company, adding also their own signatures. There was no pretence for charging the individual members at law, upon the contract, if they had authority to execute the obligation in behalf of the corporation, although without such authority they might have rendered themselves liable as upon their own contract. And yet, this is the case cited by Judge *Blackstone,* Mr. *Fonblanque,* and most of the elementary writers, English and American, as the leading, if not the only authority, that on the dissolution of a corporation, its debts are extinguished, and that for their recovery, there is no remedy at Law or in Equity ; and for the addendum or amplification of the doctrine by Chancellor *Kent,* that "neither the stockholders nor directors or trustees of the corporation, can recover the corporate debts or be charged with them in their natural capacity," see 2 *vol. Com. 5th edit.* 307. *The case* in *Levinz,* it is quite clear, involves no such principle.

Judge *Story* has been criticized with no little asperity in the course of the argument, for having stated that upon the dissolution of a corporation its contracts are not thereby extinguished : but the creditors may enforce their claims against any property belonging to the corporation, which had not passed into the hands of a *bona fide* purchaser. (2 *Eq. Jur.* 688, §1252.) And for relying on *Mumma vs. The Potomac Company* (8 *Peters* 281) as authority for his doctrine.

In all frankness, I must say our cis-Atlantic commentator is far better sustained by the case in *Peters,* for the *dictum* in

his Equity Jurisprudence—a *dictum* pregnant with the purest equity, than is his great trans-Atlantic predecessor, in prescribing the rule which he has in relation to defunct corporations, upon the precedent in Levinz.

Judge *Blackstone* was more fortunate, when he planted himself upon the Civil Law, as the foundation of this doctrine. After stating the rule he adds, "agreeable to that maxim of the Civil Law—*si quid universitati debetur, singulis non debetur ; nec quod debet universitas, singuli debent,* (1 *Black. Com.* 484,) citing *Ff.* (that is, the *Digest* or *Pandects,* for these two are convertible terms,) 3, 4, 7, viz: that which is due to a corporation at large and collectively, is not due to the particular members of such corporation, and cannot be recovered by them in their separate capacities; so, the particular members thereof may not be sued for the debts of such corporation, collectively.

This maxim, which stands detached in the original text, (*page* 105,) and is no where else to be found in the *corpus juris civilis* or body of the Roman Law, is attributed to *Ulpian,* who was a member of the Imperial Council under *Alexander Severus ;* the authority of his legal opinions, together with those of *Papinian, Paulus, Gaius and Modestus,* were confirmed by a decree of the Emperor *Valentinian III,* and were alone permitted to be cited in the Courts of Justice. The opinion of the majority of the five were to govern ; and in case of disagreement, the opinion of *Papinian* was to be preferred. He, says *Heneccius,* in his History of the Ancient Roman Jurisprudence, was every where called, *Juris asylum, et doctrinæ legalis thesaurus.* Enviable distinction !

Mr. *Phillimore,* in the preface to his late Commentaries upon International Law, states it as a remarkable fact, that from the reign of *Claudius* to that of *Honorius,* a period of about 360 years, England was governed by the Civil Law; and her judgment seats were filled by some of the most eminent of those lawyers, whose opinions were afterwards incorporated into the Justinian Compilations. And among these were *Papinian, Paulus* and *Ulpian.* Occasionally, too, Mr. *Phillimore* adds

some maxims of the Roman Law, admitted either from their intrinsic merit or through the influence of the Clergy, enriched the then meagre system of the English Law.

Thus, then, we trace this maxim to Judge *Ulpian* of the *British* Bench. Whether the maxim which has caused this digression be one of those which was incorporated into the law, from its "intrinsic merit", I will not undertake to say. It may furnish, at any rate, a sufficient explanation why the corporators could not be made individually liable in an action. of debt or any other action, *at Law*, upon the contracts of the corporation ; at least, under the technical rules of pleading, as they formerly stood.

With a single remark, I will dismiss this branch of the investigation. It will be perceived that the ground now urged with so much earnestness, for the maintenance of this ancient rule of the Common Law, had nothing to do in its establishment, namely: the hardship and injustice of making the corporators liable, in their natural capacity, to creditors, after they had lost the power of collecting their debts. Neither the decision in Levinz nor the maxim of the Civil Law, allude to any such motive. Both rest upon principles quite different, and purely technical.

I next propose to analyze the rule itself, and to consider its several parts, with a view to a clearer comprehension of its true import and extent.

And 1st. As to lands and tenements. Upon the dissolution. of the corporation, these revert to the person, or his heirs, who granted them. This doctrine is laid down as law in *Rolle's Abridgment,* (*London Edition,*) 1668, *p.* 816. And the reason assigned is, that in case of a body politic or incorporate, the fee simple vested in their politic or incorporate capacity, created by the policy of man; and therefore, the law doth annex a condition, *in Law*, to every such gift or grant, that if such body politic or incorporate be dissolved, that the donor or grantor shall re-enter, for that the cause of the gift or the grant faileth. (1 *Co. Litt. by Thomas,* 196.) The grant is: only during the life of the corporation, which may endure for-

Moultrie *et al. vs.* Smiley and Neal.

ever; but when that life is determined by dissolution, the grantor takes it back by reversion, as in case of every other grant for life.

There is but little in the Books that contradicts or questions this doctrine; and the cases that look a different way, maintain that the lands would eschcat. They will be found collected in 1 *Vol. of Co. Litt. by Thomas*, 195, *note* 7. This branch of the rule may have but little, if any thing to do with the present question. It may become a matter of some interest, upon the expiration of our various rail-road charters, should that contingency ever arise. It ought, and I apprehend will be, provided for by legislation in the meantime.

2dly. As to what becomes of the goods and chattels. It is a little remarkable, that the standard books are almost silent upon this subject. In the argument of the case of *Colchester vs. Seaber*, (3 *Burr.* 1866,) it was alleged by Sir *Fletcher Norton*, and apparently acquiesced in by the Court, that the goods and chattels go to the Crown. Mr. *Kyd*, who has collected most of the cases on corporations, concludes his remarks on the effect of dissolution, in these words: "what becomes of the personal estate, is perhaps not decided; but probably it vests in the Crown". (2 *Kyd on Cor.* 516.)

3dly. As to the rights and credits of an aggregate corporation. They are necessarily lost. Why? Because there is no one in existence who can claim or control them. The artificial person is dead and left no representative behind; lands and goods do not perish by the dissolution of the corporation. They have still a visible, tangible being, and may become the subject of possession or occupancy, by some body. Not so with debts. Why? They cannot exist without an obligor and an obligee—a promissor and promissee—a payer and payee. And upon the death of either one of these necessary parties, without the possibility of a representative, the obligation, or promise, or debt, is said to be extinguished. Or in other and more appropriate language, *it abates;* and for the reason here assigned and for none other. And such is the language of all the Courts, when treating of this subject.

I propose to consider now the true meaning of the word *extinguished,* when used in this connection.

I am not ignorant of its etymological definition. Lord *Coke,* "the Hercules of the Law", who has written so much, has furnished this also : " Extinct", he says, " cometh of the verb *extinguere,* to destroy or cut off ". (*Co. Litt.* 1 *vol. by Thomas,* 464.) But the proper inquiry is, what is its *legal* signification, when applied to the debts, to and from a defunct corporation ?

I have said, elsewhere, that the only idea intended to be conveyed was, that the debts were uncollectable, for want of proper parties to sue and be sued. Is this reason *" imaginative"*, as it has been pronounced ? If so, I am happy to know that I am not responsible for the fiction. Mr. Chief Justice *Sharkey,* in delivering the opinion of the Supreme Court of Mississippi, in the case of the *Commercial Bank of Natchez vs. Chambers et al.* (8 *S. & M.* 9,) says : " it was said in argument, with much plausibility, that even without the interposition of the Legislature, the debts due to and from the bank would have survived its dissolution. That these commercial corporations should be regarded as partnerships, and the fund or property owned by them—a trust fund, which Equity would appropriate to the payment of their debts. The current of decisions seems to have fallen into a different channel ; and it may now be regarded as the settled doctrine, that on the dissolution of a banking corporation, the debts due to and from it are extinguished. *Not by any implied condition in the contracts, but from necessity, because there is no person in whose favor, or against whom they can be enforced".* (*p.* 47.)

This "imaginative" reason for the rule, then, seems to have impressed itself upon other Courts. Indeed, it was the reason assigned for the rule in the *Bishop of Rochester's case,* decided in the 38*th of Queen Elizabeth,* the earliest reported case which I have found upon the subject, and has been recognized and repeated in all the subsequent adjudications, from that day to this.

It will not do, I apprehend, to make departure from our

own variable opinions, the measure of absurdity in others. This fiction is a "fixed fact". At any rate, I shall adhere to it until some other and better reason is assigned as the foundation of the rule.

And notwithstanding some little verbal refinement, the learned Chief Justice who delivered the opinion of the Court in *Coulter et al. vs. Robertson*, (2 *Cush. R.* 322–3,) arrives at the same conclusion with his distinguished predecessor, as to the reason of this rule.

How wide is the difference in the meaning of the word extinguishment, when applied to an obligation or debt which is irrecoverably lost for the want of a remedy to enforce it, viz: proper parties to sue and be sued; and an obligation or debt which has been discharged by performance or payment.

*Sed satius est petere fontes, quam sectare rivulos.*

With this conviction on my mind, I have searched with painful laboriousness, and by the aid of experts, better versed than myself in translating unknown tongues and deciphering blackletter-lore, the fountain heads of the law, in order to satisfy myself as to the sense in which the term extinguishment is to be understood, in connection with corporations; I have examined the Posthumous Publication of Brooke, "*La Graunde Abridgment*", (*London Edition*, 1576,) which contains, as all subsequent compilations do, a chapter upon "Extinguishment". The author cites his cases from *Fitzherbert's Abridgment*, and from the records of the Year Books to which he had access, and is admitted by Mr. *Reeves*, Chancellor *Kent* and other annotators, to have reported them with great care and accuracy; I have continued the search through *Coke on Littleton*, (2d *London Edition*, 1629); through *Rolle's Abridgment*, (*London Edition*, 1668); through *Viner*, (2d *London Edition*, 1791–94,) who makes *Rolle's Abridgment* the basis of his, and who spent nearly fifty years upon his work—the most voluminous production of any single individual in the whole bibliography of the Common Law, and which Judge *Story* characterizes as "vast Index of the Law". And thus, pursu-

ing this tract, I have traveled down to the last American edition of *Bacon's Abridgment, by Bouvier.* It will be found that these authors reiterate, pretty much, the same *dicta*, and cite the same cases in illustration of them. And the result of the whole is, as deducible from these and all kindred and cotemporary sources, that the term *extinguishment* has, in the law, no fixed, uniform and universal meaning, but varies with the subject-matter to which it is applied. And that the words, *merger, suspension* and *abatement*, would, in many instances where *extinguishment* is used, much more accurately and felicitously express the idea intended to be conveyed. In support of this conclusion, I had selected numerous examples which I designed to have embodied in this opinion; but fearing that the benefit to be derived from this addition would not compensate for the inordinate length to which this opinion is likely to be extended, I have resolved to omit them; and in lieu thereof, I will confine what I have to say to the title, *extinguishment*, in *Bacon.* And this I do the more willingly, as the author has introduced or referred to most that is worthy of being preserved from the preceding abridgments, as well as most other standard works upon this head of the law. At the close of the opinion of the Supreme Court of Delaware, in the case of the *Commercial Bank against Lockwood*, (2 *Harrington*, 1st case,) it is stated that at Common Law, if a creditor appoints his debtor his executor, the debt is *extinguished*; and *Bacon* is cited as authority for the doctrine. And this reference is made to explain what is meant by the *extinguishment* of the debts of a dead corporation. It will be found on p. 150, of the 4th volume of the new edition. Why extinguished? "*For in this case*," says *Bacon*, "*he cannot sue himself*." And I would suggest, that when the debtor appoints his creditor his executor, the debt may be said to be *extinguished*, in the same sense and for the same reason assigned by *Bacon.* The history of the rule, as to the appointment, by the creditor, of his debtor to be executor, operating as an extinguishment of the debt, is instructive and admonitory. Like the rule of the Common Law, relating to corporations, it stood, for its support,

upon the old authorities. (*Co. Litt.* 264, *b. note* 1. *Sir John Needham's Case,* 8 *Rep.* 136. *Hobart,* 10. *Cro. Car.* 372.)

By and by, the Courts begin to intimate, and very properly, that no such rule should ever have existed; until finally, they have created so many exceptions to it, and leaned so far in restricting its generality, as almost amounts to its abrogation.

And consequently, under the adjudications, both in England and in this country, the *debt,* now, is never considered as lost; but the remedy, only, as gone; and the money due is considered as assets in the hands of the executor.

In *Simmons vs. Guthridge,* (13 *Ves.* 262,) Lord *Eldon* said, "In every case of a decree against an executor, an interrogatory ought to be put by the master, whether he is charged with being a debtor, as in *Sadlier vs. Sir Stephen Lushington;* and is he a debtor to the estate or not; and if he is, that debt is assets".

So, in the leading case of *Eagleton & Coventry vs. Kingston,* (8 *Ves.* 438,) the same learned Chancellor remarked: "The principle in this Court is, that where a suit is instituted for the administration of the effects of a testator, the executor, if a debtor to the estate, is bound to deal with himself exactly as he would with any other debtor. Therefore, if the money is out upon personal security; and much more, if there is no security, as the Court would charge an executor for not calling it in; so, they would take it from him who is both executor and debtor, and place it with the Accountant General, till the proportion in the bulk of the property coming to him can be ascertained".

By sifting this doctrine thoroughly, it will be found that the apparent confusion and contradiction to be met with respecting it, has been the result of not discriminating between the extinction of the thing itself, and the extinction of the action for its recovery. In the case of *Woodward vs. Lord Darcy,* (*Plowden,* 186,) as early as 4 and 5 *Philip and Mary,* the distinction was clearly taken, that by making the debtor executor, "notwithstanding the *action* for the duty was gone, and

it was a chose in action, yet the *duty* is not extinguished, but it shall be assets in the executor's hands".

Thus we see how and why it is that debts are said to be extinguished, by making debtors executors. Will it be pretended that this mode of extinguishment, is similar in its nature to that which is effected by the payment of the debt?

But let us return to *Bacon* for further illustrations of the meaning of extinguishment.

" When one, indebted to the estate of a lunatic by specialty, is appointed committee of his estate, and the specialty is transferred to and received by him as a committee, *the debt is extinguished;* and the securities to his bond, as committee, are liable for so much money received by him". (4 *Ba. Abr.* 150—citing *Joyner vs. Cooper,* 2 *Bailey's R.* 199, which fully sustains the text.)

" So, where the obligor marries the obligee, this is said to be *an extinguishment of the debt; for by the intermarriage, they became one person, and cannot sue each other*". (*Ib. Bacon.*)

This doctrine of *extinguishment of debts,* and the reason upon which it is founded, " *imaginative*" though it may be, seem to be treated, every where, as inseparable as cause and effect.

The principle of this last *dictum* is as old as the Year Books. It is thus stated by *Brooke*: "If a man makes a bond to a *feme sole,* and afterwards marries her and they are divorced, the woman shall have her action upon the bond. Objected, that it was at one time *suspended. Sed per curiam.* She shall have all her goods, the property in which can be known, and which have not been destroyed or sold during the coverture": Citing 26 *Hen.* 8, *c.* 7. *Brooke. Ex. & Sus.* 314.)

Thus, it will be perceived that *Brooke and Bacon,* use *suspension* and *extinguishment,* to signify the same thing—as convertible terms. In this instance, the former is obviously the more proper of the two.

This case shows further, that notwithstanding a debt may be *extinguished,* in the sense in which this term is used in the

law as applicable to certain rights; that still, the *obligation* survives and may be enforced.

In the late case of *Shields vs. Yonge, Superintendent, &c.* (15 *Ga. R.* 349,) my brother BENNING has very conclusively vindicated another term of the law, from a like misapprehension. It is the word *merger.* In all the authorities upon Criminal Law, it is laid down, that if a felony is committed, the private injury is merged, or drowned, or swallowed up in the public wrong; whereas, my learned colleague shows conclusively, that the private injury is merely *suspended* until the crime is prosecuted. At Common Law, a forfeiture of all that the offender had, following the felony, there was nothing left out of which reparation could be made. And in this sense, and in this only, was the right, itself, said to be lost or cut off. And that if any thing can be found, out of which compensation can be made, after the public injury is avenged, redress might be had.

The two cases are, in principle, entirely parallel.

I am here reminded of a familiar analogy, drawn by the senior Counsel in this case, in support of his understanding of the doctrine of extinguishment. It is somewhat out of the line of investigation I had arranged for myself; nevertheless, I will take notice of it here, lest it should escape me.

He says that the rule which he seeks to have applied to dissolved corporations is not new in the law. That when a man marries, he takes his wife and her property with the burden of her debts. In other words, the law raises an implied promise to pay all her debts. And for this promise, considers the marriage a sufficient consideration. That the property adds nothing to the consideration, for he is equally liable, if she have no property. But how long does this promise and liability continue ? during the time the marriage, which was the consideration, lasts and no longer. If the creditor of the wife, *dum sola,* neglects to collect his debt during the coverture, the debt is lost. He cannot collect it of the husband if he survives : nor can he collect it of his representative if she survive him.

And more than that, if she carry to him a large property, he has it all; and by her death, it is freed of the burden of her debts, which the marriage had imposed.

Now the inference is, that when the franchise is lost by the expiration of the charter, and there being no personal liability imposed on the directors at Common Law, it necessarily can only arise under the charter, and formed a part of the contract; and that being an entirety, and the liability not having been enforced during the existence of the bank, the 8th fundamental rule under which the action was commenced, must abide the fate of the rest of the charter, and perish with it, unless there had been some stipulation inserted that this clause should outlive the residue, and that the directors should remain individually responsible, after the demise of the corporation.

The strict rule of law resulting from the contract of marriage, is correctly stated, with some qualifications. It is a strict rule of the law which casts upon the husband, during coverture, all the obligations of the wife; and by the same strict rule of law, he is discharged after the coverture ceases, by the death of the wife; and as a set-off against the hardship, that the husband shall be answerable for the debts of the wife, when he receives nothing from her, a husband may receive with the wife an estate worth a million, yet if he happens not to be sued during the coverture, he is not liable. The latter is viewed as a recompense for the hazard he runs in marrying.

It is conceded that the law is thus written, and that it is competent for the Legislature, alone, to alter it. Neither Courts of Law or Equity can disturb it.

But there are some qualifications of this rule, which it will become important to notice, as will be discovered during the progress of this opinion. The husband is liable, not as the *debtor*, but *as husband*. It is still the debt of the wife, and if she survive him, she continues personally liable for it. And this is not all—not only do the *choses in action*, which belonged to the wife, *dum sola*, and which were not reduced to possession during the coverture, survive to her upon the death of the husband: but if, at her death, she leave behind her *any choses*

*in action,* these, although they belong to the husband as her representative, are, nevertheless, to be considered as assets, in respect of which he will be chargeable with her debts. (*Fitzherbert,* 121. 3 *P. Wms.* 409. *Cas. Tem. Tal.* 173.)

I propose now to review the cases relied on in the argument, and which it is insisted by Counsel, are in contradiction to the idea that extinguishment, as used in the Common Law rule, respecting defunct corporations, results from the disability to sue and be sued.

Some of these authorities are not new. They were employed before the Courts of Mississippi, where these bank questions have undergone a more thorough discussion than any where else. To my mind, they are perfectly reconcilable with the position which I occupy.

What was the case of the *Commercial Bank vs. Lockwood's Administrator,* (2 *Harrington's Delaware Rep.* 1.) This bank charter was obtained in 1812, and was to continue till September, 1822. In February, 1822, its charter was extended till March, 1824. In January, 1824, it was extended till March, 1827; and in January, 1827, to March, 1830; and it was declared that it should continue until that time, *and no longer.* March 1830 passed without any further extension of the charter, when the corporation became, of course, dissolved. And in this condition it remained, till March, 1832, when the Legislature passed an Act to revive the defunct bank, and to re-invest it "with all the rights, powers and privileges it theretofore had". The bank, subsequent to this period, attempted to revive, by *scire facias,* a judgment obtained against Lockwood in 1827. But the Court held that it was not the intention of the Legislature to revive the debts due to and from the Bank. " And the Court, with a good deal of parade", says Judge *Clayton,* in *Nevitt vs. Bank of Port Gibson,* "go on to say, that if such had been the intention of the Legislature, it would have been unconstitutional."

Whether, when a corporation is once dissolved, it cannot, by a subsequent special law, be revived so as to revive the debts due to and from it, is a mooted point. The weight of author-

ity, I grant, is in favor of the negative of this proposition. But I am inclined to think, that upon principle, this power can be maintained.   *Bishop of Rochester's* case, and *Edmonds vs. Brown and Sillard,* already noticed, and indeed, so far as my researches have extended, the earlier cases are that way.   And if *Colchester vs. Seaber,* decided unanimously by the *King's Bench,* with Lord *Mansfield* at its head, in 1766, about the period of our Adopting Statute, *be law,* such would seem to be the law of this State, however this case and the doctrine which it holds, may have been questioned or over-ruled elsewhere.

The facts stated in this case, show that the bond sued on was given to a corporation consisting of three parts:   That one of these vital, integral parts had become extinct, so that the corporation could not, by any power of its own, under its charter or constitution, be re-animated.   And this, in point of law, amounts to a dissolution.   (*Grant on Corporations, top p.* 314.) But the Court held, that notwithstanding the corporation had been disabled from acting from 1740 to 1763, and was without the power of self-renewal, still, that by the grant and acceptance of the new charter, the old corporation was revived, so as to collect the debt.   (3 *Burrow's R.* 281.)

It is admitted that natural and artificial persons stand upon the same footing in this respect; and that if a natural person dies without the possibility of a legal representative, in being or expectancy, the debts due to and from him would be as totally extinguished as those of a dead corporation.   Suppose, that on the death of a natural, as well as of an artificial person, all debts due by that natural person were declared, by law, to be extinguished; and that by a miracle, as was the case with Lazarus, the deceased debtor and creditor was re-animated— what would become of the liabilities to and from the temporary decedent? would they not be resuscitated, notwithstanding the vital spark had been quenched for three days, and corruption had already commenced its work? So it is with an artificial person.   Their rights and credits are extinguished by dissolution.   They fall, necessarily, from the lifeless hands which are no longer able to grasp them.   Still, it would seem to be com-

Moultrie *et al. vs.* Smiley and Neal.

petent for the omnipotence of the Legislature to breathe into the corporation corpse the breath of life, and restore it to its legal existence. At any rate, I concur fully with the Supreme Court of Pennsylvania, in the case of *Bleakney and another vs. The Farmer's and Mechanic's Bank of Greencastle* (17 *Serg. and Rawle* 64), that such an Act of the Legislature "would work no injustice, infringe no man's rights, and impair no contract."

But this point, however grave in itself, has no bearing upon the question before the Court; and I have glanced at it, out of respect to the learned Counsel who have adduced the precedent from Delaware, where it was determined. I will endeavor to dispose of the remaining cases more briefly.

The point decided in *Butler vs. Palmer* (1 *Hill's N. Y. Rep.* 324) was simply this: That it is competent for the Legislature to pass an Act, limiting the time within which a mortgage lien might be redeemed; and that the right was gone, unless enforced within the time limited; and that all inchoate rights derived under the law, became extinct by its repeal or expiration. Had the Statute of New York attempted to take away the existing right of redemption, absolutely, or incumbered it with conditions that would have rendered it useless; or had the rights, acquired under the existing law, have been perfected far enough *to stand independent of the Act,* and the effort had been made by the Legislature to interfere with them, the Courts would not have felt themselves bound to give it effect. *Bronson vs. Kingie et al.* (1 *Howard's S. C. Rep.* 320) and *McCracken vs. Hayward,* (2 *Ibid* 608) establish these principles.

*Coulter et al. vs. Robertson* (2 *Cushman's Rep.* 321) is another authority relied on with emphasis, by one of the learned Counsel who have argued this cause. There, a trustee of a dissolved bank was appointed by Statute to collect funds sufficient to pay all the *debts* of said bank; when that was done, the Court held that his office was performed; and that his rights and powers as trustee were at an end; and that he could not collect for the purpose of distribution among the stockholders: and that any debtor might defend himself, successfully, against a suit at the instance of the trustee, by pleading and

proving that the whole of the *indebtedness* of the dissolved bank had been discharged.

I am content that this decision shall stand for as much as it is worth, without note or comment.

In *Paschall vs. Whitsett*, (11 *Ala. Rep. N. S.* 472,) it was held that the stockholder of a corporation was not liable to the process of garnishment, under the Act of 1841, of the State of Alabama, at the suit of its creditor, after the dissolution of the corporate body. By that Act, the plaintiff, in a judgment against a corporation, "is entitled to the rights and benefits of all the laws now in force, regulating the issuance of garnishments". And again, upon an affidavit being made as directed, a garnishment is required to issue, summoning the "garnishee to answer what he is indebted as stockholder or otherwise". Further, "the stockholders of any incorporated company shall be liable, respectively, to the creditors of such company, for the amount of stock subscribed by them and unpaid, in character of debtors to such corporations; and such liability may be enforced by garnishment," &c. (*Clay's Digest*, 260-1.)

The point of the decision under the Statute was, that no one could be said to be the *debtor* of a corporation after dissolulution; and that the process of garnishment would not lie, where there was no subsisting indebtedness, at the time.

The case of *Lindell vs. Benton & Kennedy*, (6 *Missouri R.* 364,) is a direct authority to the contrary. It was there held that if a garnishment issued by the creditor of a bank against its debtor, be *served*, such debtor is bound to answer, notwithstanding the expiration of the charter before judgment on the garnishment.

While Mr. Justice *Thacher*, (than whom no Judge has been more strenuous in enforcing the Common Law rule, in all its stringency,) in his dissenting opinion on the re-argument of *Nevitt vs. Bank of Port Gibson*, does not controvert this decision, he puts it upon the peculiar phraseology of the Statute of Missouri, which provides, that "from the time of serving process of garnishment, all moneys and effects due and owing, payable or belonging to such corporation, shall be bound until

Moultrie *et al. vs.* Smiley and Neal.

the judgment against the corporation is satisfied". (*Digest of* 1835, *p.* 126.)    Under this Act, he considered this a case of judicial assignment of property and credits belonging to the bank, which assignment, by service of the garnishment, took place prior to the dissolution.

I believe it is not denied but that *choses in action*, assigned by a corporation, may be recovered by the assignee, notwithstanding the dissolution of the corporation. (*The Bank of Alexandria vs. Patton and others*, 1 *Robinson's Va. Rep.* 499. *May et al. vs. The State Bank of N. Carolina*, 2 *Ib.* 56.) Whether the same effect will be given to an assignment, by operation of law, I am not prepared to say.

But according to the application of the Common Law rule, as now contended for and as adjudicated in Alabama, in *Whitsett's case*, what signified it that Lindell was the judgment creditor of the bank, and the garnisher of Benton and Kennedy, who were the debtors of the bank before the charter expired?    There being no corporation in existence, at the time when the defendants were called on to answer, the ground taken is, that no such right had vested in the creditor as would not be extinguished by the expiration—by limitation of the charter.

I would invite attention to the fact, that the Court in Missouri refused the motion to discharge the garnishees, on the ground that the garnishment was not a suit between the bank and the garnishees, the interest of the bank having been *vested* by virtue of the Statute, previous to the expiration of its charter, in Lindell, the plaintiff in garnishment. *How vested* will be seen by the terms of the Act which I have quoted.

*White vs. Campbell et al.* (5 *Humphries' R.* 38,) is another case relied on by Counsel for the plaintiffs in error, and affords a striking illustration of the *enlarged* statement of the Common Law rule, by Chancellor *Kent*, that the debts due to and from a corporation *civiliter mortuus*, are so totally extinguished that neither the stockholders, nor the directors or *trustees* of the corporation, can recover these debts or be charged with them.

On the 19th of January, 1844, Campbell executed his note for the sum of $3400 to the president, directors and company of the Bank of the State of Tennessee ; to secure the payment of which, he, on the same day, executed a deed of conveyance, in trust, to the premises in controversy, to one Cummings. On the 19th of February, 1844, White obtained a judgment in the Circuit Court of Knox County, against Campbell, for the sum of $2500, and cost of suit; upon which, execution was issued and levied upon the real estate contained in the deed of trust. The charter of the incorporation of the president, directors and company of the Bank of the State of Tennessee expired on the 20th day of November, 1841, and White filed his bill to have the deed of trust set aside.

*Turley,* J. delivering the opinion of the Court says : " that the Bank of the State of Tennessee was not in existence, at the time the note and deed of trust were executed, is not and cannot be controverted. The necessary consequence is, that both the note and deed of trust, are inoperative and void : the one for want of a payee and the other for the want of a *cestui que trust*". And citing the rule as laid down by Chancellor *Kent,* the learned Judge adds: " these principles would prevent a recovery of the debt intended to be secured by the deed of trust, even if it had been executed before the expiration of the charter—*a fortiori* will, it having been contracted after."

The Supreme Court of Tennessee understand the rule, with its apparent extension, precisely as we do. Indeed, it can admit of but one construction.

Chancellor *Kent* did not intend to innovate upon the rule, as laid down by Judge *Blackstone.* He simply meant to say, that upon dissolution, *corporate* rights and liabilities cannot be saved or enforced, by or through the intervention of any of those intermediate agencies who stand in the place of the corporation.

*Fox vs. Horah,* (1 *Iredell's Eq. R.* 358,) is the only remaining authority which I shall notice. It is one which has been reviewed in the Mississippi Bank cases, and repeatedly pressed, with unabated confidence, upon the consideration of this Court.

Moultrie *et al. vs.* Smiley and Neal.

In the first place, the Court repeat the rule as found in all the elementary writers, that upon the dissolution of a corporation, unless the Legislature has otherwise directed, its real estate, undisposed of, reverts to the donor or grantor; the personal property, as having no owner, goes to the State for the benefit of the public; and the choses in action, such as debts, &c. become extinct, *"because there is then no one to demand the money."*

The Legislature of North Carolina had, in the Revised Statutes of 1831, incorporated a provision, directing what proceedings should be had against corporations, in certain cases : but the Court held that the Statute did not apply to cases where the corporation expired by the limitation of its charter, which was the case with the State Bank, at the Salisbury Branch of which Fox's indebtedness was contracted.

The Court further decided, that the note sued on being payable to the cashier of the bank as trustee, for the use and benefit of the bank, by whom it was discounted, gave him the legal title, so as to entitle him to recover it at Law; yet, that in Equity, the bank having the sole right to the money, the right to sue became extinct, by the expiration of the charter, before the money was collected.

I propose to make a pretty full analysis of this case, not only on account of the importance attached to it by Counsel, but also because I entertain a profound respect for the distinguished Jurist who delivered the opinion. No man, who has presided in the American Courts, with a solitary exception, perhaps, enjoyed a higher reputation while living, or has left a brighter name to go down, on the page of professional history, to posterity. To him may, with propriety, be applied the beautiful compliment paid by Cambden to Edmund Plowden : *Ut in juris Anglicani scientia, de qua scriptis bene meruit facile princeps ; ita vitæ integritate inter homines suæ professionis nulli secundus.*

Judge *Gaston* admits that the questions involved, were not free from difficulty ; and that they were then, (1841 !) for the

*first time,* presented for judicial decision.   Certain it was, he said, that *neither the researches of the Court nor those of the bar, had furnished any adjudications which had a direct bearing upon the points.*   Hence, he resorted to elementary principles to fix and apply the true doctrine to the case before him. He next reverts to the Common Law rule, as to extinct corporations, citing Lord *Coke* in support of the first branch of it, as to real estate, but none whatever as to the disposition of the goods and chattels, *or choses in action.*   He defines the last to be the rights of the corporation to demand money in the hands of the persons by whom it is withheld.   That they derive their existence from contracts, or *quasi contracts,* by which the relation of debtor and creditor was created.   That when the creditor corporation died, and there was no successor—no representative, the relation of debtor and creditor ceased, and the debt become, necessarily, extinct.

That there could be but little doubt, that if the debt had been contracted directly with the corporation, by name, and the judgment thereon rendered for the corporation, the debt and judgment would have been, to all intents, extinguished by the death of the corporation; and the collection thereof could not have been enforced by any legal process.   But that according to the forms of this contract, the cashier, and not the bank, was the legal creditor.   As such, he had obtained his judgment, *" which was not extinguished by the death of the corporation, and which he has the undoubted power to collect by legal process".*

Having stated these propositions, the great question in the case is propounded, is it against conscience in the cashier to collect the debt?   The Judge satisfies himself, and what fair mind can gainsay it, that it is, and therefore granted a perpetual injunction to prevent such a result.

The debts of every kind, from, as well as to the bank, were extinguished.   The stockholders were under no personal liability.   If Horah collected the money, he was not bound, neither could he be compelled to account therefor to any one.   He might have kept it for his own use.   No respect can be paid to

a pretended trust, the performance or non-performance of which, is dependent upon the will of the supposed trustee. "If," says the Judge, "the cashier can rightfully collect this money, it is because he has a right to collect it, for his own use. After much consideration, we are of the opinion that he had not a right to collect it for his own benefit."

I shall attempt to show, before concluding this opinion, the application of these cases, to the one at bar.

. I had intended dwelling at some length upon the cases of *Colchester vs. Seaber* (3 *Burr.* 1866) ; and the *King vs. Pasmore* (3 *Durn. and East.* 199). But I am constantly admonished to be brief. *Quicquid praecipies, esto brevis.* Neither of these English authorities decide any question involved in the present issue. They were both cases of incorporated towns, or municipal corporations, which had failed to continue their succession, by the election of proper officers, and thereby became dormant, if not dead. In the first case, it was held, that the King, by his letters patent, had revived all the rights and powers of the old corporation ; and in the second, that the old corporation was so far dissolved as that the Crown could grant a new charter, which would take the place of the old. I must think the task somewhat difficult to reconcile these decisions. I do not feel it incumbent on me to undertake it.

I do not deem it necessary to refer to the distinction between the personal liability of the members of private monied corporations, and public municipal corporations. With respect to the former, we have conceded that no individual responsibility attaches for the corporate debts, though the incorporation may be sued for the recovery of them. But with regard to the inhabitants of a town incorporated by law, and against which no private action will lie, unless given by Statute, each inhabitant is liable to satisfy the debt; still, it can only be reached and recovered through the corporation. And if that be dissolved before judgment, the personal liability of the members is extinguished.

A reference to one or two more authorities will conclude what I have to advance, by way of preliminary remark or intro-

duction to the views which I entertain relative to this particular case.

In *Steavenson vs. Oliver* (8 *Mees. & Welsb.* 234) Lord *Abinger*, Chief Baron said, " It is by no means a consequence of an act of Parliament's expiring, that rights acquired under it, should likewise expire." And *Parke*, Baron, said, " There is a difference between a temporary statute and statutes which are repealed. With respect to the former, the extent of the restrictions imposed, and the duration of the provisions, are matters of construction."

"It is a well established rule, that statutes incorporating companies, conferring privileges and professing to give the public certain advantages in return, are to be construed strictly against the corporation, and liberally in favor of the public. *Grant on Corporations* (*marginal page* 309), citing *Parker's Great Western Railway Company* (7 *M. & Gra.* 263.)

In this same treatise, marginal page 304, I find the following paragraph, and quote it for as much as it is worth : " The principle has been broadly stated, that a corporation may be dissolved for some purposes, and remain for others." Referring to *Guardians Woodbridge Union vs. Guardian Colnies Union* (18 *Law J.* (*N. S.*) *Q. B.* 133, 134.) To which the author adds, "but the subject, at present, requires judicial illustration." (*Ib.*)

We recur now to the main question propounded at the outset—did the action of debt, brought against the directors, under the 8th rule of the Act of Incorporation of the Commercial Bank of Macon abate, by the expiration of the charter during the pendency, and before the termination of the suit ?

Rule 8th provides that " The total amount of the debts which the said corporation shall at any time owe, whether by bond, bill, note or other contract, shall not exceed three times the amount of their stock paid in, over and above the amount of moneys actually deposited in their vaults for safe-keeping ; in case of excess, the directors, under whose administration it shall happen, shall be liable for the same, in their individual, natural and private capacities ; and an action of debt may, in

Moultrie *et al. vs.* Smiley and Neal.

such case, be brought against them, or any of them, their or any of their heirs, executors or administrators, in any Court of record in the United States, having competent jurisdiction, or either of them, by any creditor or creditors of the said corporation, and may be prosecuted to judgment or execution, any condition, or covenant, or agreement to the contrary notwithstanding. But this shall not be construed to exempt the said corporation, or the lands, tenements, goods and chattels of the same, from being also liable for and chargeable with the said excess; and such of the said directors who may have been absent, when the said excess was contracted or created, or who may have dissented from the resolution or act, whereby the same was so contracted or created, shall be liable as other directors, for said excess. But such directors may be entitled to recover out of the directors assenting to such excess, by action of debt or on the case, the amount which they may have been compelled to pay." (*Prince's Digest,* 101.)

I am not prepared to say that the directors in this case, who were actually guilty of the mismanagement, would not be *individually* liable to bill-holders, independent of this statutory provision. For it is a maxim of the Common Law, that any one specially injured by the breach of duty in another, shall have his remedy by action. If they are not, it must be because the loss sustained by their misconduct, was the result of mere error, unmixed with negligence or fraud. By the terms of the Statute, even this constitutes no defence for a violation of the charter, in making an over-issue. But I forbear to discuss this point.

And I ask, what rule of the law, taken in all its length and breadth, is impugned, by holding that the personal liability of the directors may be enforced, notwithstanding the expiration of the charter creating it? Who is the obligor and obligee, the promissor and promissee, under this 8th rule? Is it not the directors, under whose administration the excess was committed on the one part, and the bill-holder on the other? What is it to them that the charter of the Commercial Bank of Macon expired on the 1st day of January, 1852? And that from

and after that time all *corporate* liabilities were extinguished, because there was no longer any corporation creditor to sue, or debtor to be sued? These directors and bill-holders survived and survive in their natural capacities; and it is not necessary, under the charter, for the one to reach and subject the other, through the corporation, as in the case of municipalities. It is true, the charter is not to be "so construed as to exempt the corporation or the lands, tenements, goods and chattels of the corporation from being also liable for and chargeable with the said excess." The Legislature must have considered that these illegal acts of the directors were done by them in their official capacity, and that they must have received the express or implied sanction of the stockholders, and hence should be binding on them—that the illegality attached not to the directors solely, but to the whole corporate body—that they were *in pari delicto* the directors in performing, and the corporators in ratifying, by not repudiating and restraining those illegal acts. *Qui tacit consentire videtur.*

It has been assumed in the argument, that the judgment previously obtained by these creditors against the bank, is discharged; and the lien fixed, by law, upon its assets, released by the dissolution. For the sake of the argument concede this. Does the loss of one of the securities guarantied by the charter, deprive the creditor of the benefit of the other? A note, protected by mortgage, may be barred by the Statute of Limitations (and this charter is a twenty years' Statute of limitations, *pro hac vice*) in other words, the note is *extinguished*; still, the mortgage lien may be enforced. Where two or more persons are jointly, but not severally liable on a simple contract debt, a judgment obtained against one, is, at Common Law, an extinguishment of the claim on the other debtor. But here the corporation and the directors are severally and not jointly liable; the one in their collective, and the other in their individual character. And yet, it is contended, that the discharge of the debt by operation of law, as to one, is a discharge of both.

No one doubts the power of this and other banks to draw,

accept or endorse bills and promissory notes.    Suppose a bill
had been drawn by an individual or another bank, and accept-
ed by the Commercial Bank of Macon; and the latter failing
at maturity to pay, the paper had been protested, and notice
given to the drawer, before the expiration of this charter—
would there be any question as to the liability of the drawer?
So, if the Macon Bank had been the maker of a negotiable
note, which was subsequently endorsed, the liability of the en-
dorser would be indisputable, notwithstanding the expiration
of the Macon Bank charter.

*The President, Directors and Company of the Middletown
Bank vs. Russ and others* (3 *Conn. Rep.* 135) was a case
where a manufacturing company became indebted to the plain-
tiffs on notes made by its agent to one Wolcott and others,
and by them were endorsed to the Middletown Bank.    At ma-
turity, payment was demanded and refused, and notice given
to the company and endorsers.    I ask, had this manufacturing
company, after that, ceased to exist by the efflux of time, would
the endorsers have been discharged?    And if not in these ca-
ses, why should the expiration of this charter, admitting that
it extinguished all corporate liability, shield these directors
from an action "in their individual, natural and private capa-
cities," which was given against them, and not only them, but
their heirs, executors or administrators, and which was author-
ized to be prosecuted to judgment and execution in any Court
of Record in the United States, having competent jurisdiction;
and that, too, in despite of "any condition, or covenant, or
agreement to the contrary!"    So determined were the Legisla-
ture to give efficacy to this provision, in restraint of over-bank-
ing, that it is expressly enacted that no condition, *in law* or in
deed, (and is not the plea here set up, directly in the face of
this clause, viz: that you may do this, upon the implied con-
dition that suit is brought during the continuance of the char-
ter,) I say, so resolved were the Legislature to uproot the temp-
tation to this mischief, that not only no condition, but even a
"*covenant or agreement*" between the parties to that effect,
shall not arrest this statutory remedy : but the solemn stipula-

tion between the parties, founded upon a valuable considera-
tion for this purpose, is to be set aside, like gaming and usuri-
ous contracts, as against public policy, and declared by the
Courts to be null and void.

On the brief of the senior Counsel, I find this definition of
the word *extinguishment*: "an annihilation of a collateral
thing or subject, in the subject itself, out of which it is de-
rived". It will be found in *Burrill's Law Dictionary, part
I. p.* 461. And the author cites *Preston on Merger*, 9. I
have before stated, that extinguishment is very often, in the
Books, confounded with merger. And this remark is made
by Mr. Burrill, himself, immediately following the foregoing
definition. And well it might be. His own definition is a
proof and illustration of the fact; for by referring to *Preston
on merger*, it will be seen that it is there used for the consoli-
dation or union of one estate with another, as where a Prior
has an annuity outside of his parsonage, and afterwards pur-
chases the other and can obtain an appropriation of it, the an-
nuity is extinct or merged. (2 *Henry*, 4 *ch.* 19.) So, if one
has a road appendant or common appendant in others' land,
and purchases the fee, and afterwards disposes of the fee, there
the road or common is extinct forever. (11 *Henry*, 4 *ch.* 5.)

But it is needless to multiply these cases, which have come
down from the Year Books. Grant, if you please, that the
extinguishment of the main thing had the effect of extinguish-
ing the incidents growing out of it; still, the rule, when applied
even to rights or debts, would not avail these parties; for, *quoad
hoc*, they are the body, and the corporation but the limbs. They
are the head and front of this offending. This liability has been
incurred by their mal-administration of the affairs of the cor-
poration. Their malfeasance or official mismanagement, is the
wrong for which this redress is given. An excessive issue was
forbidden by the Legislature, and it is for disregarding this
inhibition that these suits are instituted. The directors may
not, knowingly and intentionally, have violated the express
prohibition of the law, in this respect. I know some of them,
and they are honorable men—men upon whose escutcheon the

stain of dishonor, or even the suspicion of it, never attached; still, from whatever cause *the acknowledged violation* arose,. whether from negligence, mistake or any other cause, the effect, as to the parties to this suit, is the same. The law will not hold them guiltless. The law does not expect nor stipulate for infallibility. *Lex non cogit ad impossibilia.* And I thank God that it does not; but when it distinctly forbids a thing to be done, and annexes a certain responsibility for disobedience, its mandate must be respected or the consequences submitted to.

So, then, to make the definition from Burrill available, it should have been reversed. The legal maxim is—*Accessorium non ducit sed sequitur suum principale.* That the incident does not lead, but follows the principal: whereas, here, the extinguishment of the collateral is made to work the extinguishment of the direct liability. In this instance, neither controls, but the one is wholly independent of the other.

Having disposed of the definition, let us consider, for a moment, the analogy from the law regulating the marriage contract. We have seen that if the debt of the wife, contracted *dum sola,* was not collected during the coverture, it was said to be *extinguished.* Nevertheless, say the authorities, it being the debt of the wife and not of the husband, if he died, the debt survived against her. Now we have attempted to show, that this was the debt or default of the directors. One, for good reasons, from which the corporation was not exempt, provided it was prosecuted during the existence of the corporation. But as against the directors, who occasioned the injury, why should it not survive the legal death of the bank? Just as the debt of the wife survived the legal death of the husband? We must think the analogy makes strongly against the ingenious Counsel who have invoked its aid.

Is there any thing, in the case of *Fox and Horah,* adverse to the conclusion, that the liability of the directors survives the termination of this charter, or in conflict with the exposition which has hitherto been given by this Court, to the Common

Law rule applicable to defunct corporations? If so, then I have studied that case to little purpose. Like all the other precedents adduced from the State Courts, it affirmed, in general terms, the Common Law doctrine, that upon the civil death of a corporation, the debts due to and from it are extinguished. But Judge *Gaston* proceeds—"but according to the terms of the original contract, the plaintiff (Fox) became bound to pay the money to the defendant (Horah). This constituted him, and not the bank, the legal creditor of the plaintiff. As such, he has obtained his judgment, which is *not* extinguished by the death of the corporation; *and, which he has the undoubt-ed power to collect by legal process.*"

Surely this portion of the opinion of this eminent Jurist,. must have escaped the notice of the lynx-eyed Counsel who have investigated this question with such untiring industry. Because the note was given to `Horah, the former cashier of the expired bank, although for the money of the bank, and he having no personal interest in it, this Court held, that being the *legal* creditor of the borrower, and having obtained his judgment upon this note, as *at Law* he was entitled to do, the debt was "*not extinguished*" by the dissolution of the charter. And that this mere nominal, ostensible holder, had "the un--doubted power to collect it by legal process". But the Court, sitting in Chancery, decreed that it was against conscience to tolerate so unjust a proceeding; and consequently, granted an injunction to restrain the judgment.

If this unreal, shadowy and seeming liability from Fox to Horah, and which could have been defeated in this State, even at Law, according to the uniform decisions of this Court, was not *extinguished*, because, on its face, the note was made payable to Horah *as cashier*, although, in fact, due and owing the bank, how can it be claimed, upon the authority of this case, that this primary, direct and personal liability of these directors is cut off—destroyed, by the expiration of this bank charter? And if it be not, is it against conscience, in these creditors, to compel the payment of their demand? Would a Court of Equity find any pretext, here, for interposing to shield these

defendants from the consequences of their own *acknowledged* delinquency ?

It would be a waste of time to review, at length, the other cases. *Fox and Horah* is the strongest. And by that, I am willing to have this judgment tested and tried, and if found in hostility to it, pronounced erroneous. In this, as well as in all the other cases, from Alabama, Tennessee and elsewhere, the decision of the Court turned upon the fact, that virtually, the defunct corporation was a party to the litigation; and that being a corporation suit, it must, under the common rule, abate. But no such issue is involved here. This suit is brought to enforce a distinct, separate and independent undertaking. And in the language of the Court, in the case in *Iredell,* "certain it is, that neither our own researches nor those of the Counsel, have furnished any adjudications" which apply to such a case; and maintain, that such a collateral liability is defeated by the civil death of the corporation. After a thorough examination of the whole range of English and American authorities, ancient and modern, I entertain the utmost confidence that none such can be found. I have searched diligently for the reason upon which the rule of the Common Law is based. I believe that I have stated and applied it correctly.

But, say Counsel, and this I consider the most plausible view that has been taken of this question, when the charter was dissolved, by its expiration or from any other cause, the entire contract, and every part thereof, was vacated; for the contract being an entirety, it could not be dissolved in part, and still subsist for certain purposes. The State agreed to grant to the stockholders, upon certain precedent conditions, the franchise embodied in the charter, and the stockholders, on their part, agreed, amongst other things, that they would not issue more than three times the amount of the capital stock paid in, over and above the amount of deposits. That the bank should pay the bills in specie, when presented; and that if any of the stockholders are made directors, they will not be guilty of an overissue; and if they do, the property and effects of the bank shall be liable; and that in addition to this, the directors would

be liable, in their persons and property, for said excess; and that it was further mutually understood and agreed, that if the said bank failed to comply, on its part, the charter might be forfeited, and the State might institute proceedings to vacate the contract; and if they were so dissolved, and also upon the expiration of its charter, on the first day of January, 1852, the contract would no longer have any binding force or effect. The real estate belonging to the bank should revert to the grantors—its personal property be seized by the State; and all the debts due to and from it, at that time, should be extinguished.

Now the argument is, that as the stockholders stipulated that as directors, they would be personally responsible for an over-issue; and that part of the contract was obligatory upon them during its existence; yet, it is but fair, just and equitable, that they should be discharged from it, since the rights and privileges guarantied by the charter, have been annulled by its extinction. That this clause, by which the stockholders are made personally chargeable, is not a super-added stipulation, subsequently entered into by the directors, at the time of their election, but an original item in the contract, as it was ratified between the State and the stockholders. It was a part of the compact and could not survive it; and when the charter expired, this expired with it, just as all the members of the animal body cease to pulsate when the body dies.

This ingenious method of stating the case, is opposed, of course, to every aspect in which we have endeavored to present the transaction, and the law arising out of it. We are called upon to point out the paragraph in this charter, which extends the *individual liability* of the *directors*, beyond the period fixed by the charter for its own expiration. For all the purposes of this decision, we have conceded that all *corporate* rights and liabilities are extinguished by the dissolution of the bank, on the first of January, 1852. We have attempted to show that this results from the necessity of the case. We have attempted to show, and we think successfully, that no such reason applies to the personal responsibility incurred by

Moultrie *et al. vs.* Smiley and Neal.

a portion of the stockholders, *as directors*, during the existence of the incorporation; and no authority has been cited, negativing this conclusion.   We insist, therefore, that the burden is upon those who assail our position, to point to the proof in the charter, that this *individual* liability ceases with that of the company, and that such was the intention of the Legislature.   We admit that this intention may be inferred, as to the aggregate liability, from the operation of the rule which we have been discussing ; and that the contract may be read and interpreted, as though this was inserted in it.   But we utterly deny that any such conclusion is to be drawn, so far as the personal accountability of the directors is concerned.   Indeed, apart from the legal view of the question, the very contrary is to be presumed, from the fact that the very ground upon which it is contended the private liability terminates, namely : the dissolution and insolvency of the bank is the very contingency contemplated by the Legislature, upon the happening of which the super-added security would seem to be most needed.

But let us examine this case as put by Counsel, a little more closely.   It is said that this charter is a contract, to which the Government is one party, and the stockholders are the other. By the terms of the instrument, the Government granted certain privileges to Thomas T. Napier and others, which were to continue till the first day of January, 1852, unless forfeited or voluntarily surrendered before that time.   In consideration of this grant for a definite and limited period, the said Thomas T. Napier and the other persons therein named, and all others who might subsequently become stockholders in said company, stipulated, amongst other things, that the debts of the company should, at no time, exceed three times the amount of their stock paid in, over and above the amount of their deposits. And for the fulfilment of this agreement, the stockholders bound themselves in two capacities—one, as members of the corporation, and the other as individual stockholders.   As members of the corporation, they agreed that the corporation and the lands, tenements, goods and chattels thereof, should be chargeable for said excess.   As individual stockholders,

they agreed that their persons and property should be pledged and bound in proportion to the value of shares—that each of said stockholders, should hold in the bank, for the ultimate redemption of its bills. And further, that in case an over-issue should be made, whoever of said stockholders should be directors at the time, should be liable in their individual, natural and private capacities for said excess, in an action of debt, to be instituted against them, or any of them, their heirs, executors or administrators, in any Court of Record in the United States having jurisdiction of the matter; and that said suit might be prosecuted to judgment and execution, any condition, or covenant or agreement, to the contrary notwithstanding.

Here, then, are the same persons liable in two different ways for the same debt, created inchoately at least, at the same time, by the same instrument, and upon the same consideration. It is not pretended but that the Government has faithfully kept and performed its part of the contract. And it is agreed by the defendants on the record, that under their administration as directors, there was an over-issue of bills more than sufficient to cover the amount sued for. It is insisted, however, that because the undertaking of the stockholders, as members of the corporation, that the corporation should be liable, is extinguished by virtue of the Common Law rule, its charter having expired, the individual undertaking must fail also, to which no such rule applies.

It does seem to me, that simply to state this proposition, is to refute it. And that it is founded in neither law or logic.

It could be satisfactorily demonstrated, I think, this was not a contract made between the State of Georgia and *a corporation,* but one which was entered into between the State and *the individuals therein named,* who, as the preamble to the charter recites, had already subscribed for the stock in the contemplated bank, and all such persons as might, by assignment of stock or otherwise, become stockholders: whereby, *The Commercial Bank of Macon* was brought into being. But I forbear to enter upon this investigation. Of one thing I entertain no doubt; and that is, that had the stockholders in any of our

Moultrie *et al. vs.* Smiley and Neal.

railway companies stipulated with the State, that in consideration of the privileges and immunities granted, at the expiration of their charter, the road, with all of its fixtures and equipments, should be transferred to the State; and that for the due execution of this agreement, they bound themselves in their individual, natural and private capacities, in double the value of said property, no Court in the United States would hesitate to coerce a compliance with the contract. "Ah!" it will be said, "in the case supposed, the instrument shows, upon its face, that this part of it was not to be performed until the expiration of the charter". Very true; but so far as these individual obligations are involved, it matters not when they are sought to be enforced, whether before or after dissolution. They rest upon a wholly different footing from that of corporate liabilities, to which the doctrine of the Common Law rule applies.

Again: Suppose one of our railway charters should provide, that for all injuries done to the persons of passengers, by the misconduct of any officer, that said officer, his heirs, executors and administrators should be personally liable to the party aggrieved, in an action of trespass, in any Court in which he might be sued, "any condition, covenant or agreement to the contrary notwithstanding." And that said provision should not be so construed as to exempt the corporation from liability for said trespass. And suppose a passenger should be seriously crippled by the reckless running of the train, on the day before the charter expired; and that in consequence thereof, no suit could be prosecuted against the company, there being no body politic or incorporate, answering to the name, who could be sued, what is there, in this Common Law principle, which would constrain the Court to refuse to entertain an action against the engineer or conductor, by whose mismanagement the damage was inflicted? We apprehend that the dissolution of the company would interpose no difficulty, as to the right of recovery against the offending officer. And so in the case at bar.

Further: Suppose these directors had given their notes to

these creditors, for the amount of their claims;. and the corporation had expired before collection could be made—would this have constituted a good defence; even in Equity, against a recovery upon the notes? If not, then it is not allowable in the case, as it now stands. For it is immaterial, whether the obligation to pay be by express contract or implied, under the Statute. If it would be a good defence, then we should take one step more. Under the 8th rule, while *all* the directors who were in office at the time the excess was committed, are made liable to third persons, it is further enacted, that such of them as were absent at the time, or being present, protested against it, and from whom a recovery may be had, are entitled to go over against their associates, who were actually in fault. Suppose a recovery to have been had, in this very case, before the expiration of the charter, and a suit had been brought by the directors, who were innocent of actual wrong against their colleagues, for re-imbursement, since the expiration of the charter—can it be supposed, for a moment, that the Legislature intended that the expiration of the charter should defeat this right? In the language of Lord *Mansfield*, (3 *Burrows*, 870,) "without an express authority", and I will add, a legislative intent "too strong to be gotten over, we ought not to determine a case, so much against reason". And yet, every argument may be urged in favor of the application of the Common Law rule to this case, as to the one under consideration. This is one of the "incidents" that is extinguished with the "principal"—one of the "limbs" that ceases to pulsate when the "body" dies.

The individual stockholders who were directors when this excess was committed, and the corporation, are both principal debtors. I am not sure but that, under all of our bank charters, containing individual liability clauses, that instead of looking upon the stockholders as guarantors or sureties of the company, that both should be deemed principal debtors—and that but for the requirement that the creditor shall first proceed against the corporation, that he might sue either, at his election—and this requirement is no more than applying an equi-

table principle, that the debts should be paid from the joint funds of the associates, rather than from the separate property of any one of them.   But as it respects these directors no such principle obtains; and by its omission, the Legislature has manifested their interpretation of the contract, that it is the debt of the individual stockholders, who, as directors, committed the excess ; that it attached upon their persons and property the moment the over-issue was made, and might be enforced at any time thereafter, whether the directors remained in office or had gone out—and continued until it was discharged.

Much has been said in the course of the learned and lengthy discussion which this cause has occasioned, as to the hardship of enforcing this personal liability upon the directors, when they have been deprived of the benefits conferred upon the company, by the expiration of their charter.   But were the bank still in operation, would these directors have a remedy over against the corporation for re-imbursement ?   I am inclined to think they would not, for the reasons already suggested. It will be observed, that while under the 8th rule the directors, who may have been absent when the excess was contracted, or who dissented from the resolution creating the same, are entitled to recover out of the directors assenting to such excess, the amount which they may have been compelled to pay, no provision is made for them to have recourse over against the corporation or the other stockholders for contribution.

But, under any circumstances, bill-holders cannot control the matter.   They cannot prevent violations of charters—stockholders can.   And if the Legislature intended security to any class, it is hardly to be presumed that it would be to those who violated the law or acquiesced in it, whereby these losses are entailed upon the public.

Besides, the stockholders were the proper persons to apply to the Legislature, to intervene and prevent the Common Law principle from attaching and depriving them of the power to collect their assets, and make them available.   This duty did not devolve on the creditors ; nor should they be chargeable

with neglect, nor visited with loss for not attending to it.    And to prevent such consequences, it is the duty of Courts to put the most liberal construction upon these charters, and to struggle hard to get away from the Common Law rule, so far as creditors are to be prejudiced by it, as did the Supreme Court of Massachusetts, in *Folger vs. Chase*, (18 *Pick. R.* 63) and' as have all the Courts of this country where the rights of creditors were to be injuriously affected by its rigid application.. *Every decision sustaining the constitutionality of statutes, passed to prevent the Common Law rule from attaching to dissolved corporations, is proof of this assertion.*

The charter under consideration is only a part of a great system intended to secure the credit of corporations, by superadding the responsibility of the individual members, to that of the corporation.    And after listening patiently to the able and voluminous argument submitted at the hearing, and diligently reviewing the whole case since, I do not feel constrained, by any principle of law or equity, good morals or sound reasoning, to render the judgment of reversal which is asked at our hands by the plaintiffs in error.    Indeed, *these* all conduct me to· a contrary conclusion.    I will merely subjoin, that on the minor points in this case which, with the exception of that as to interest, are mere matters of form, and not of substance; technical and not substantial objections; we *unanimously* affirm the judgment of the Circuit Court.    In *Lane vs. Morris*, (10 *Ga. R.* 162) this Court held that the bill-holder was entitled to claim interest from the stockholder, not from the time that payment was demanded of the bank, nor from the return of *nulla bona* by the Sheriff on the *fi. fa.* against the bank, but only from the time that payment was demanded of the stockholder.    We see no reason to lay down a different rule in this suit against the directors; still, this point has not been argued, although made in the bill of exceptions.

I have now gone through this case, and touched upon all the points which appeared to me deserving of consideration. Some portion of what I have here expressed might have been spared; and the consideration of several of the topics may be

Moultrie *et al. vs.* Smiley and Neal.

deemed immaterial to the conclusion to which I have come; but as they were introduced into the discussion, I deemed it respectful to give my views concerning them. That there are difficulties connected with them, I freely admit. What subject has no difficulty in this world? What truth, however luminous, that projects no shadow around it? I have written just what I believed, and nothing more nor less. After the most laborious and careful examination, I am satisfied that my construction of this charter is tenable, while the opposite theory is not. And that in no point of view can the defendants escape the liability sought to be fastened upon them.

------

STARNES, J. concurring.

The main question in these cases, in my opinion, admits of a very simple solution. The difficulty which has arisen, as I think, grows out of an error in applying the Common Law rule, that "upon the dissolution of a corporation, its real estate reverts to the grantor; its personal estate goes to the Crown, (in this country to the State) and its debts are extinguished," to the case made against these plaintiffs in error. That rule does not affect or control these cases, for very plain reasons.

The debt here is sued for as the debt of individuals, and not as the debt of a corporation; and it was the debt of these persons, before the dissolution of that corporation. It is true, that the Commercial Bank of Macon was liable for *all* the bills emitted by it, as well those which were issued in excess, as others; but from the time that excess happened under the administration of these directors, it *became their debt also,* by virtue of a provision in the 8th of the fundamental rules and regulations of the charter issued to said bank. That provision is as follows: "The total amount of the debts which the said corporation shall

at any time owe, whether by bond, bill, note, or other contract, shall not exceed three times the amount of their stock paid in, over and above the amount of moneys actually deposited in their banks for safe-keeping; in case of excess the directors under whose administration it shall happen, shall be liable for the same, in their individual, natural and private capacities, and an action of debt may, in such case, be brought against them or any of them, their, or any of their heirs, executors or administrators, in any Court of Record in the United States, having competent jurisdiction," &c.   The charter further, as if for the sake of explicitness, and to make plain the character of the liability of the corporation, and the directors in case of such excess, provides that " this shall not be construed to exempt the said corporation, or the lands, tenements, goods and chattels of the same, from being *also* liable for, and chargeable with the same excess," &c.

Thus, this regulation of the charter makes that excess, which would otherwise have been the debt of the bank only, the debt of the directors also; and does this in such terms as clearly creates a several, if not a joint and several liability of this corporation and of these directors.   And the latter were so made liable, "in their individual, natural and private capacities" *eo instanti,* that the excess happened under their administration.

If the debt, as due by the corporation, has been extinguished, it has not been by *payment;* and what show of reason is there in the proposition, that because the charter of this bank has been forfeited, and *its* debts are in this way extinguished, although this excess has never been paid, yet that no recovery can be had for and on account of it, against these defendants, who were severally and independently liable to pay it?   True, the debt may no longer exist against the corporation, because of its dissolution, nor against the members of that corporation *qua* corporators, nor because of their having been corporators, but this affords not even a technical reason, if it have not been paid, why it should not exist against other persons who, by contract, or *quasi* contract, have undertaken, equally with the corporation, and severally, to pay the debt.

I suggest this illustration :    We will suppose that the Merchant's Bank of Macon, in this State, for a valuable consideration, draws its check on the Bank of the Republic in New York, in favor of A, citizen of Macon.    In due course of trade B agrees to receive this check from A if he will make himself responsible therefor.    Whereupon, A transfers it to B, and indorses thereon an agreement to pay the same, as a joint and several maker, waiving all notice, &c.    B goes on to New York, presents the check, and is informed that there are no funds in hand to pay it.    He returns to seek payment from the drawer, but in the meantime, the charter of the Merchant's Bank has expired, and its debts are extinguished.    Will any one venture to hold that the several liability of A, to pay the check, is also extinguished because of such dissolution ? If not, it should not be insisted that the liability of the directors, in the cases at bar, was extinguished by the dissolution of the corporation.

In this view of the subject, all difficulty is obviated (if difficulty there be) growing out of the argument, that a charter is to be regarded as a contract between the stockholders of a corporation and the State ; and that when a contract falls, all rights springing out of it must go with it.    The right to hold these directors responsible, cannot be said to depend, alone, on the contract between the State and the corporators, but springs out of the statutory liability of these defendants, which, if not *ex contractu*, is *quasi ex contractu*, and was incurred by each director, when this excess happened; he, by accepting the office of director, having agreed to become subject unto the obligations and liabilities which the charter created ; one of which was, that he should be held responsible for such excess of issues, as might happen during his administration.    *Bullard vs. Bell*, (1 *Mason*, 292, 293.)

This appears to me a reasonable and just view of the subject, without reference to the *rationale* of the Common Law rule to which I have referred.    An examination of the reasons for that rule, however, will strongly sustain the positions I have assumed.

Moultrie *et al. vs.* Smiley and Neal.

The radical principle on which that rule rests is, simply, that what is due to a corporation, or artificial body, is not due to the natural persons composing it; and when anything is due from such a body, it is not owing by the natural persons constituting it. The same rule prevailed at the Civil Law, and was expressed by the words, *si quid universitati debetur, singulis non debetur; nec quod debet universitas, singuli debent."* (*Ff.* 3, 4, 7. *Domat Civ. L. Book* 2. *Tit.* 3 *Sec.* 3. 3 *Par.* 1452. *Angel & A. on Corp. chap.* 22, §7.)

Of course it follows, that when a corporation is dissolved, not having heirs or legal representatives, nor the legal possibility of such, if the power creating it has made no other provision, its debts are no longer due by any one, or to any one; that is to say, there remains no person in being, natural or artificial, responsible for them, or who may collect them, and they must necessarily become extinct. This is all that Sir *William Blackstone* means to say, in the passage so often cited at the hearing of this case, when he says, "that the debts of a corporation, either to or from it, are totally extinguished by its dissolution; so that the members thereof cannot recover or be charged with them in their natural capacities," as is proven by the fact, that he declares this Common Law rule to be "agreeable to that maxim of the Civil Law" which I have quoted above. (1 *Black Com.* 445.) And this is what is meant by the repetition of the doctrine in the other books and cases which were cited by the Counsel for the plaintiffs in error. I will refer to a few of the more prominent of these cases. They must be taken as examples of what is held in the others; for to comment on all would consume too much time and attention.

Let us look, first, to the case of *Fox vs. Horah,* (3 *Ired. Eq. R.* 358) a leading case on this subject, and one concerning which, in the argument, it was said " it could not be distinguished from that at bar, it might be *over-ruled."* There Judge *Gaston* said, "when the creditor corporation died, and there was no successor, no representative, the relation of debtor and creditor ceased, and the debt became necessarily extinct."

Another case, the most recent decision which was brought to the attention of this Court (*Coulter & Richards, Exrs. vs. Robertson, Trustee,* 2 *Miss. Cush.* 278) and which was relied upon by one of the Counsel for the plaintiffs in error, as exceedingly appropriate to his case, very explicitly and forcibly supports this view of the subject.    Ch. J. *Smith,* in that case says, "It may now be regarded as the settled doctrine, that on the dissolution of a banking corporation, the debts due to and from it are extinguished; not by an implied condition in the contract, but from necessity, because there is no person in whose favor, or against whom, they can be enforced." Again, he says, "A debtor and a creditor are essential to the very existence of a debt.    There can be neither debt nor obligation without there be in actual being, or in expectancy, with the legal possibility of an actual existence, a person by whom the debt may be paid, or the duty performed, as well as a person who may receive the payment of the debt or accept the performance of the obligation.    Wherever, therefore, the payor or the payee, the debtor or the creditor, or the person by whom the duty is to be performed, or who is to accept the thing which is to be done, ceases to exist without a representative, or the legal possibility of a representative, the debt or obligation ceases to exist, and the obligation of payment or performance is forever at an end." Nothing can be more correct than this, and nothing more in harmony with, and in support of the views which I have just presented.

It may be true, as was remarked by one of the Counsel for the plaintiffs in error, that we cannot always find the accurate reasons for a great Common Law principle, and that such a principle will sometimes survive the reasons in which it had its origin.    But I think I have shown, that is to say, I think Sir *William Blackstone* and others to whom reference was made in the argument as authority, have shown—and I think Judge *Gaston* and Ch. J. *Smith,* whom I have just cited, (and whose opinions will not be disputed, unless the Counsel take issue with each other) have shown, that the principle in question is one which has *not* survived the reasons on which it is based.

Indeed, it is, in my opinion, one of those plain principles, which carries the reasons on which it rests, in its own inherent nature.

The same counsel was of the opinion, that the case of *The Mayor &c., of Colchester vs. The Executor of Seaber* (3 *Burr.* 1866) was opposed to the idea, that upon its dissolution the debts of a corporation are extinguished, because there is no one to sue and be sued. Lord *Kenyon* said of this case in *Rex vs. Clarke,* (2 *East,* 75) that it did not pass without doubt, and Mr. J. *Lawrence* observed, that it was questioned in *Rex vs. Passmore,* (3 *T. R.* 199) but I am not sure that what was there decided should have been questioned, and am disposed to allow the full benefit of it to the plaintiffs in error. The Counsel is mistaken, however, in its purport. In that case, there had been a judgment of ouster against the Mayor and Aldermen of the Borough of Colchester in the year 1740, and the borough remained without officers, and without asserting its corporate rights until the year 1763, when another grant of chartered rights was made to it by the crown, and officers chosen under it. Before the old officers had been removed, a bond had been made payable to the Mayor and Commonalty by the defendant's testator, and action was brought upon it by the new magistrates. Out of this state of things arose the question, whether or not the old corporation had been dissolved by the ouster of its officers, and whether or not the corporation suing was a new and distinct corporation. If the former corporation were dissolved, its debts were extinguished—if only dormant, and it was revived by the new grant, its debts were not gone. Lord *Mansfield,* on this subject, held the following language: " I am clear, upon principles of law, that the *old* corporation was not absolutely dissolved and annihilated, though they had lost their magistrates; and by virtue of the new charter they are so revived as to be *entitled to the credits and liable to the debts* of the old corporation." And Mr. J. *Wilmot* says, " Wherever a corporation accepts a new charter, *it remains,* to every purpose, as it did before, though the name be altered," &c.

Moultrie *et al. vs.* Smiley and Neal.

It is thus made plain, that the case was put upon the ground that the corporation was never dissolved; there had always been an artificial person, *in esse*, to whom the debt was due. That person could not sue, it seems, for want of officers; but it maintained, according to the views of the Court, an artificial corporate being; its *rights* and *debts* remained the same; it retained the legal possibility of being represented by its officers (analogous in its situation, in this respect, to the estate of a deceased person, upon which there has been no representation) and when it was represented by officers, it could assert its rights. And the effect of what the Court rules is, further, that if this corporation had been dissolved, it would then have parted, not only with all existence, but the legal possibility of ever being in a situation to enforce its rights, or to be held liable on account of its obligations. Instead, therefore, of being opposed to the view I have taken of the reasons on which rests the Common Law rule under consideration, it directly supports it.

It was also insisted for the plaintiffs in error, that in the case of *The Pres. & Selectm. of Port Gibson vs. Moore*, (13 *Sm. and Mar.* 157) it was decided that though the members of the corporation had been individually liable for the debt with the corporation, yet they were released upon the dissolution of that corporation, because the debt was thereby extinguished. The case does not support this remark. Action was there brought on the debt, as one due from the Pres. & Selectm. of Port Gibson. I take it, therefore, that it was a debt due by the corporation; or at all events, only through the corporation. The P. & S. who contracted the debt, belonged to the old corporation which had been dissolved; and suit was brought against the new. The point made was, that the new charter was a revival of the old, and therefore the new corporation was liable. The Court "held that this last Act did not revive the old corporation, but was a new creation—a new Act of incorporation, and did not revive former liabilities of *the old corporation* extinguished," &c. No point was made in relation

to the liability of individuals for the debt, and nothing in relation thereto was decided.

I could easily show, that none of the cases which have been cited controvert the views I have presented, and that some of them strongly support them; but a further examination of cases would occupy too much time and space. I therefore leave them with the observation, that not a single case which I have ever seen, directly or indirectly disturbs the conclusion, that the reasons for the Common Law rule we have been considering, are such as have been presented; and not one in which this rule was recognized and applied, was a case in which, by the terms of the charter or otherwise, the natural person against whom suit was brought, had been made equally and severally liable with the corporation for the debt.

If then, such be the reasons for this rule, the reasons and the rule fail to apply to these cases, when it is shown that this charter contains a provision, by virtue of which and by reason of their having accepted office subject to it, these directors became liable individually and severally, together with the bank, for the payment of any excess of issues beyond what the charter authorized, which might happen during their administration; for then, notwithstanding the dissolution of the corporation, there did remain a person who was liable for the debt, and against whom action could be brought for it.

There being no difference of opinion between the members of the Court as to the other point made in these cases, the judgment of the Court thereon is delivered by my brother LUMPKIN.

Moultrie *et al. vs.* Smiley and Neal.

BENNING, J. dissenting.

Smiley brought an action of debt against Moultrie and others. In his declaration, he alleged that the defendants were the directors of the Commercial Bank of Macon, on the 29th of September, 1847; that the bank then owed, and up to the bringing of that his suit, had continually owed, an amount of debts exceeding three times the amount of the stock of the bank paid in, over and above the amount of moneys actually deposited in its vaults for safe-keeping; that he was then a creditor of the bank for one hundred and seventy dollars, besides damages and interest, by being the holder of the promissory notes of the bank to that amount; that he had got judgments against the bank upon these notes, and had had *fi. fas.* issued on the judgments, and that the *fi. fas.* had been returned, with the entry on them, of no property to be found.

To this declaration, the defendants pleaded that the existence of the bank, by the act incorporating it, was limited to the first day of January, 1852, a day which (at the time of filing the plea) had passed.

To this plea the plaintiff demurred, and the Court sustained him in the demurrer.

To that decision the defendants excepted, and it is that which they have presented for review to this Court.

On review, a majority of this Court have affirmed that judgment. I did not think that that judgment ought to be affirmed, and therefore I dissented from the judgment of this Court. I am now to state my reasons for my dissent.

The declaration in this case is founded on a part of the eighth rule of the charter of the Commercial Bank of Macon. The eighth rule is as follows: "The total amount of the debts which the said corporation shall, at any time owe, whether by bond, bill, note or other contract, shall not exceed three times the amount of their stock paid in, over and above the amount of moneys actually deposited in their vaults for safe-keeping— in case of excess, the directors under whose administration it

shall happen, shall be liable for the same in their individual, natural and private capacities, and an action of debt may, in such case, be brought against them or any of them, their or any of their heirs, executors or administrators, in any Court of Record in the United States having competent jurisdiction, or either of them, by any creditor or creditors of the said corporation, and may be prosecuted to judgment and execution, any condition, covenant or agreement to the contrary notwithstanding. But this shall not be construed to exempt the said corporation or the lands, tenements, goods and chattels of the same, from being also liable for and chargeable with the said excess; and such of the said directors who may have been absent when the said excess was contracted or created, or who may have dissented from the resolution or act whereby the same was so contracted or created, shall be liable as other directors for said excess. But such directors may be entitled to recover out of the directors assenting to such excess, by action of debt or on the case the amount which they may have been compelled to pay."

Assuming the declaration to be true, the "promissory notes" of the bank, considered as consolidated, are evidence of the existence of only *one single* debt. But the debt is a debt, to the payment of which are "liable" *two* parties—the bank and the directors. The bills are not evidence of the existence of *two* "independent" debts, to the payment of one of which is liable the bank, and to the payment of the other the directors. This, it seems to me is manifest, both from the language and the reason of this eighth rule. This, therefore, I shall assume to be true.

This debt is one which exists, as I think I may say all debts do, by *contract*—by *some* contract, either expressed or understood. This debt is one, for the recovery of which, the prescribed remedy in the said eighth rule is an action of debt; and that is an action which always has to be founded on contract.

The debt is also one which is evidenced by "promissory notes," and these the charter makes to be contracts as in the eighth rule, when it says: "The total amount of the debts

which the said corporation shall, at any time owe, whether by bond, bill, *note or other contract*, shall not exceed," &c.; and as in the eleventh, when it says, "the bills obligatory and of credit, *notes and other contracts* whatsoever, on behalf of said corporation, shall be binding," &c.

Besides, if the charter is, itself a contract, every provision in it must be some part of the contract—must be matter of contract. And this Court, in the *Irvington Bridge Co. vs. Harrison*, (6 *Ga. R.*) decided a charter for the incorporation of a bridge company to be a contract.

This debt exists by contract. Who are the parties to the contract? on one side the bill-holder, on the other the parties liable to pay the bills—the bank and the directors.

Now, when on one side of a contract there is a plurality of parties, they must stand as joint contractors, or as joint and several contractors, or as several contractors. In reference, therefore, to the contract under the eighth rule for the payment of these bills, the bank and the directors are to be considered as occupying the relation of joint contractors or of joint and several contractors, or of several contractors.

And of these parties, thus liable to pay the bills, the one I think is a principal, the others sureties. The directors, in my opinion, are but sureties for the bank—they have been so treated by the plaintiff himself. He first sued the bank, and had a return of no property, as against the bank, and he states these facts in his declaration, as a part of the cause of action which he has against the directors, and the plaintiff is, on one side, the party to the contract—that is to say, is the holder of the notes.

And that the bank occupies the place of a principal in the contract, also appears, I think, from this, that it was the bank and not the directors, it is to be presumed, that got the consideration which there was, for the issue of the notes. If the bank itself had paid these notes, could it, holding on to that consideration, go over upon the directors and make them repay it, what it had paid in taking up the notes? Whereas, if the directors had paid the notes, what is there to prevent them from having had re-imbursement from the bank?

Does not the same thing appear too from this? The charter, by the fifteenth rule, provides that the stockholders shall be bound, in person and property, for the ultimate redemption of the bills issued by the bank, meaning does it not, such bills as shall be issued *not* in "excess"—the eighth rule having said, that for the redemption of those issued in excess, the directors, as well as the bank, should be liable. Now, under a similar provision to this fifteenth rule, contained in another bank charter, this Court has said that the relation which the *stockholders* sustained towards the bank, was that of sureties. (11 *Ga. R.* 517. 8 *Ga. R.* 478.) And whatever reasons exist for saying that as to the bills issued *not in excess*, the stockholders shall be sureties and the bank principal, the same reasons exist for saying that as to the bills *issued in excess*, the directors shall be sureties and the bank principal. So to me it seems.

I think I may say, then, of these parties, thus liable by contract to pay these bills, the one party stands as principal, and that is the bank; the other as surety, and that is the directors.

If this be so then, as by the law of principal and surety, whatever even *discharges* the principal, although it does not *extinguish the debt*, discharges the surety—the dissolution of this corporation was the discharge of the directors from this liability; for the dissolution of a corporation is, without dispute, the *discharge* of the corporation itself from its debts.

But say it is not true that the directors are only sureties for the bank, then the debt being but a single debt, they must be liable to pay it either as joint contractors with the bank, or as joint and several contractors with the bank, or as several contractors. Let them be considered as liable in one of these ways.

.Now it is a general principle of law, that when what is but a single debt exists against several persons, whether as joint contractors or as joint and several contractors, or as several contractors, whatever extinguishes the debt as to one of the contractors, extinguishes it as to all.

This principle follows from the nature of extinguishment. What is the nature of extinguishment? "EXTINCT commeth of

the verb *extinguire*, to destroy or put out; and a rent is said to be extinguished when it is destroied and put out". (1 *Coke Litt.* 147 *b.*) "EXTINGUISHMENT *in contracts*, the destruction of a right or contract, the act by which a contract is made void." (*Bouv. Law. Dic.*) "WHENEVER a right, title or interest is destroyed or taken away by the act of God, operation of law, or act of the party, this, in many books, is called an extinguishment". (3 *Bac. Abr.* '*Extinguishment*')". These definitions, indeed, give but the common import of the word extinguishment.

Now when a debt is "destroyed," "put out," *extinguished,* as to one of the parties to it, the debt is, of necessity, as to all, destroyed—put out—extinguished. To destroy, to put out, to extinguish a thing at all, or as to any other thing, or for any other purpose, is to destroy, to put out, to extinguish the thing wholly, as to all other things—for all purposes. To say differently is to say that a thing may at one and the same time be dead, and yet alive. Can a thing be more than extinguished?

A common instance of extinguishment happens when one of the parties to a contract for the payment of money pays the money. Let say a bill of exchange be paid by *any* of the parties to it—by the drawer—by any endorser—by the acceptor—the debt due *to the holder* is totally extinguished. He, if paid by the acceptor, (say) cannot also get payment from the drawer. His debt, by *one* payment of it, is wholly extinguished. That is to say, when his debt is extinguished, as to one of the parties liable to him, by a payment made by that party, the debt is, as to all the parties liable to him, equally extinguished.

So, let it be supposed, that in this case this debt had been once paid the bill-holder, by either the bank or the directors, can there be a doubt that the debt would not have been extinguished, as to both the bank and the directors?

But payment is but one of the means which exist for extinguishing a debt. And there can be no difference, as to consequences between an extinguishment of a debt, produced by one means, and the extinguishment of it produced by any other. If, therefore, a debt is, by any means, as to one of the parties

liable to pay it, extinguished, it is extinguished as to all the parties liable to pay it. Payment can do no more than extinguish a debt—whatever extinguishes a debt does as much as payment can do.

The general rule then is, that whatever extinguishes what is but a single debt, as to one of the parties liable to pay the debt extinguishes the debt as to all the parties liable to pay it.

Now one of the effects of the dissolution of a corporation is, that all of the debts due to and from the corporation are extinguished.

That this is one of the effects has, after the most elaborate argument, been held by this Court. In *Thornton vs. Lane* (11 *Ga. R.* 491,) the language of this Court is—"why so much time and talent, labor and learning have been employed to establish a proposition which no body denies, viz: that the debts of a corporation, either to or from it, are extinguished by its dissolution, I am at a loss to comprehend. Certain it is, that it was recognized by this Court, at this place, two years ago, as it had been on more than one occasion previously". Indeed, in this case, this proposition was admitted, both by the Counsel for the defendant and by the majority of the Court.

It follows, that when this bank was dissolved by the expiration of the term of its charter, this debt, which it owed to this bill-holder, was extinguished ; and the debt having been extinguished, as against the bank, it follows, from the nature of extinguishment, that it was also extinguished as against the directors.

This, plainly, is the necessary conclusion from the foregoing propositions. It is therefore true, if the propositions are true. I have endeavored to show that they are true.

It was argued, however, for the defendant in error, that one of these propositions is not true in the absolute form in which it has been stated, viz: the proposition that on the dissolution of a corporation, the debts to it and from it are extinguished. It was contended that this proposition, to be true, should have had annexed to it a *condition*—such a condition as would have made it assume this form : on the dissolution of a corporation,

the debts are extinguished, provided there is not some one in existence to sue for the debts the corporation owns, and to be sued for those it owes ; but if there is any such person in existence, then they are not extinguished.    The addition of this condition was made necessary, it was urged, by the character of what was alleged to be the reason of the rule of extinguishment —that reason being alleged to be the non-existence, on the dissolution of a corporation, of any person to sue for the debts due to the corporation, or to be sued for those due from it.

The truth of this, one of these propositions, has perhaps another objection to struggle with—one which, however, was not urged in this case, although in the case of *Thornton vs. Lane*, (11 *Ga. R.* 496,) it was relied upon and stated in these words :  "And why should it be thought a strange thing for the corporation, itself, which is *primarily* liable to be exonerated under the operation of the Common Law rule to which we have adverted, and for the *personal* liability of the stockholder, which is *secondary* only, to be retained and enforced ?   It would not be pretended that a debt due by the bank, and upon which there was an *indorser*, could not be enforced against the latter, notwithstanding the discharge of the principal.   Nor is this any new principle, either in legislation or jurisprudence.   It has occurred a thousand times and oftener, no doubt, under the bankrupt acts of England and of this country, that the principal debtor has been released by law, while the debt has been enforced against other parties to the paper, who were in no way interested in its consideration, which cannot be said, by the by, of these corporations".

*This* objection, if allowed to prevail, would produce a radical change in the proposition or rule—it would expunge from the rule the word *extinguish*, and substitute words expressive of a different idea—it would make the rule take this form : on the dissolution of a corporation, the corporation is "*exonerated*" from the debts due from it, but the debts themselves are *not extinguished*.   They remain in existence, and may be enforced against any other persons who happen also to be par-

ties to them.   As to the debts due *to* the bank, the rule, if
made to take this form, is silent.

Ought the statement of the rule to be modified, in one or
both of these ways?   This is the question which I will now
try to answer.

I think the rule is not to be modified in either of these
ways.   And my reasons for this opinion are—First. That in
all of the many places in which I have seen the rule stated,
there is not one in which it is stated with either of these mod-
ifications; and the modifications are so very important as to
make me feel sure that if they existed, they would, in some
place, at some time, by some body, have been mentioned in
connection with the rest of the rule.   Secondly. I have read
a good number of decisions, made by different Courts, which,
if this rule be subject to these modifications, must have been the
reverse of what they are.   Thirdly. What I regard as the
reason of the rule, will not permit the rule to take these mod-
ifications.

As to my first reason, I find the rule stated in *Blackstone*,
in these words : " The debts of a corporation, either to or from
it, are totally extinguished by its dissolution; so that the mem-
bers thereof cannot recover or be charged with them, in their
natural capacities".   (2 *Black. Com.* 484.)   In *Kent,* in these :
" The debts due to and from the corporation, are all extin-
guished.   Neither the stockholders nor the directors or trus-
tees of the corporation, can recover these debts or be charged
with them, in their natural capacity".   (2 *Kent's Com.* 353.)
In *Angell & Ames,* in the same words as in *Blackstone.*   (*Ang.
& A.* §779.)   In *Grant,* the latest English work on corpora-
tions which I have seen, the rule is stated in these words : "The
corporation (by dissolution) is wholly gone ; and with it are
lost and avoided all its claims, debts and liabilities, of all kinds.
Both the property choses in action and other rights of the
corporation, as well as its liabilities, *ipso facto,* pass from it on.
the event of dissolution".   (*Grant on Corp.* 303.)

Now, to give the rule exactly as it is, was part of the spe-

cial business of these writers. It is to be inferred, therefore, that if the rule is subject to the aforesaid modifications, these writers did not know of it.

In every decision of any Court which I have seen, in which the rule is stated or acted on, except that of *Thornton vs. Lane,* (11 *Ga. R.*) it is stated or acted on, in a sense the same as that expressed by the writers aforesaid. Of these decisions, however, I will refer only to such as also support my second reason, which is, that there are decisions in good number, which, if this rule be subject to these modifications, would have had to be the reverse of what they are. These I will mention.

The first is a decision made in Delaware, and made on these facts : An incorporated bank got a judgment against a debtor of it. Afterwards the bank was dissolved by the limitation of its charter. A year or two after the dissolution, the Legislature passed an act "reviving, renewing, continuing and extending the corporation from the first day of March, which was in the year 1830, until the first day of March, 1835," and "reviving, renewing, granting, continuing and extending the powers; privileges, rights and immunities *theretofore granted* the said corporation." After the passage of this act, the bank took out scire facias on the judgment, to revive it. The defendant, among other things, pleaded that by the dissolution of the corporation, the judgment was extinguished. This plea was held by the Court to be a good bar. *Commercial Bank vs. Lockwood* (2 *Harrington,* 14.) The language of the Court is this : "When, therefore, the Commercial Bank, by the positive provision of its continued charter, had, after the first day of March, 1830, ceased to exist and was then dissolved without either a representative or the possibility of one, as no provision is made by our laws for a representative in such a case, the debts due to *it* became, at the instant of dissolution, in the emphatic language of the law, *extinguished*—not the right to or remedy for the debt suspended merely, but the debt itself annihilated." The word of the Court is "*annihilated,*" not "exonerated". And the act of the Court is according to the word. Now here was a case in which, notwithstanding the dissolution, there was

some body to bring suit—the revived corporation. Yet the decision was, that the revived corporation could not bring the suit—whereas, the decision should have been just the reverse of that, had the rule been that dissolution extinguishes a corporation's debts only, when there is no body to sue or be sued.

The next decision to which I refer, is one made in Tennessee, in *White vs. Campbell et al.* (5 *Humph.* 38.) It was made on these facts: After the expiration of the charter of an incorporated bank, that of the Bank of the State of Tennessee, one of the bank's debtors, gave the president, directors and company of the bank a note for the debt; and to secure the note, executed a deed of trust—on this note, judgment was rendered at law, and on the judgment, a *fi. fa.* was issued, which was levied on the property contained in the deed of trust. Afterwards, the person to whom the deed of trust was made, filed a bill to have that deed set aside as illegal.

The Court say "that The Bank of the State of Tennessee was not in existence at the time the note and deed of trust were executed, is not and cannot be controverted. The necessary consequence is, that both the note and the deed of trust are inoperative and void, the one for the want of a payee, the other for the want of a *cestui que trust.*" And they cite what I have quoted from *Kent.* The Court add, "But it is argued that it appears from the answer of the defendant, that the debt was fairly due from the defendant, Campbell, and that the intention in executing the note and deed of trust, was to secure the stockholders in that amount, and not the institution. This argument is a fallacy. We cannot recognize the existence of stockholders of a defunct corporation," &c.

Now here was some body to sue and be sued, viz: the parties actually contracting with each other; and here was the *intention* on the part of those parties, that one might sue the other; for it appeared "that the debt was fairly due from Campbell, and that the intention in executing the note was to secure the *stockholders*, and not the institution". Yet, the Court held that one party could not sue the other. So com-

pletely was the old debt extinguished, that it could not serve as the foundation or consideration for a *new promise*, secured by an instrument under *seal*. This seems to have been the view of the Court.

The next decision to which I refer, is one made in Alabama, in *Paschall vs. Whitsett*, (11 *Ala. N. Series*, 472.) It was made on these facts : " The plaintiff in error having recovered a judgment against the Gainsville & Nankeetah Railroad Company, a corporation, caused the defendant to be summoned as a garnishee". He answered, among other things, "that the company, previous to the issuing of the garnishment, ceased to have any legal existence". This answer the Court held to be a sufficient one. The language of the Court is, " But for whatever cause it may become defunct, we have seen that the debts due to and from it, are totally *extinguished;* and in no just sense can one be said to be its debtor, either as a stockholder or otherwise". Yet, in the case, there were parties and a proceeding between them, the garnisher and garnishee— the garnishment. The garnishment was founded upon a *judgment* obtained against the corporation, before its dissolution ; and in ordinary cases, a judgment may be enforced against property, even if there is *no* existing party defendant to the judgment, if, since judgment, the defendant has died. But not in the case of a judgment against a dead corporation. In that case, the debt, say the Court in italics, is *extinguished.* That is the word, not "exonerated"—not that the defendant is personally exonerated, and the debt left open against his property and his sureties. They do not say this.

I next refer to a decision from Mississippi—that made in the *President, &c. of Port Gibson vs. Moore*, (13 *Smedes & Marshall's R.* 158) on these facts. Moore had an account against the President, &c. of Port Gibson. After the account had become due, the charter of the President, &c. was repealed. Shortly after its repeal, it was revived. After the charter had been revived, Moore sued the revived corporation for his account.

The Court say, "The Act of repeal, when accepted by the

corporation, was a dissolution. It is now the settled doctrine, upon Common Law principles, independent of any Statute declaring a different rule, that upon the dissolution of a corporation, the debts due to and from it are extinguished. This is conceded in argument". And they hold the account to be extinguished. Yet, here is somebody to sue and be sued. If the rule is such as not to extinguish debts, but only to suspend them until somebody can be found to be sued, here was the place for it to have come in and made the Court give a judgment just the opposite of that which it gave. Here the old debtor, himself, was again made alive. And if the rule would not let him be sued, would it have let his surety be, supposing he had had one ? This Court, I think, would have said not. It would have said "extinguishment" must have its effect.

I come, now, to the decision in *Fox vs. Horah,* made in N. Carolina, (1 *Iredell's Eq. R.* 358) on these facts : A loan was obtained by Hoskins, with Fox and Long as sureties, from the State Bank of N. Carolina. The note was made payable to Horah, cashier. Upon this note, Horah sued the parties to it and got a judgment against them. Pending the action the charter of the bank expired, and an attempt was then made to set up this occurrence as a legal defence: but it failed, because the Court held that "the legal interest in the debt was in Horah, and the action properly brought by *him,* and whether *he* was a trustee for the bank, or any other person, was an inquiry with which a Court of Law had no concern." Then Fox filed a bill against Horah, in which he insisted that by the expiration of the bank's charter, the debt had become extinguished in equity, notwithstanding that at law, in consequence of the legal title to the debt being in Horah, the debt might not be extinguished. And the Court sustained his bill. The opinion was delivered by *Gaston,* J. and it seems to have been well considered. It is certainly very clearly expressed. The opinion has in it these words: "When the creditor corporation died, and there was no successor—no representative—the relation of debtor and creditor ceased, and the debt became necessarily *extinct.*" "Upon the death of the bank,

Moultrie *et al. vs.* Smiley and Neal.

without succession or representative, this debt became, *by law,* as completely extinguished as it would have been by a release from the corporation."

Now in this case, there was some body to sue—some body to be sued—there was, in fact, a suit at law, and what is more, a judgment of recovery in that suit—and a judgment resting upon a title good *at law* against the world.

If, then, in such a case, the Court held the debt to be extinguished even in equity, it is certain that the Court could not have considered the true rule to be that on dissolution, the debts are not extinguished if there remains any one to sue or be sued. But let it speak for itself: "It is urged that although the defendant has no equitable title to this money, neither has the plaintiff, and therefore the Court ought not to interfere, but suffer the law to prevail. Now, without repeating what has before been stated, that the extinguishment of the creditor's equitable right annihilates the equitable debt, so that the plaintiff *no longer owes,* and therefore in equity, has a perfect right to this money, it is enough that he does not owe it to the defendant, to give him an equity against the defendant. The money is yet in the plaintiff's hands, and he has a right to keep it against all the world, unless it be required from him by one to whom it is due, or in behalf of one to whom it is due. *Melior conditio possidentis.*

In short, the Court rides rough shod over the idea, that because there may be some body to sue and be sued, the debt is not extinguished.

Now these decisions are all certainly in point, to show that on the dissolution of a corporation, the extinguishment or non-extinguishment of the debts, does not depend on whether there is any body to sue or be sued. They are in point, to show that notwithstanding there may be somebody to sue and be sued, yet the debts are extinguished.

But these decisions being the decisions of Courts which have never been made the exponents of what the Law of Georgia is, are, it is true, not to be considered authoritative to her Courts. Still, perhaps, they may be regarded as some evidence of what

is the Common Law upon the question, and that is the part of the Law of Georgia which governs the question.

They are, some or all of them, in point too, to show that extinguishment of the debts does not mean suspension of the debts—"exoneration" from the debts.

I will now turn to a couple of cases that are more authoritative—a couple of old English cases :

"*A parsonage appropriated to a prior alien, was charged with an annuity, and after, was seized into the King's hands, and it was enacted by Parliament in time of H. V, that the possessions of prior aliens* SHOULD *remain in the King and his heirs forever ;* and the *King granted the parsonage to another and his successors, as it was in the King's hands ;* and the chargee brought a writ of annuity against the grantee of the parsonage, &c. And the best opinion was, that the annuity is determined, for the *corporation is dissolved.* · (*Viner's Abr. Rent, B. b. 4.*)

Now if by the dissolution of this corporation, the annuity which it owed, was merely suspended for want of some one to be sued for it, that want was supplied by the revival of the corporation in a new parson ; and the decision should have been that the new parson was liable to pay it. The decision, however, was, that by the dissolution of the corporation, the annuity was "*determined.*"

"*Money was borrowed by the Company of Woodmongers, who were incorporated, and a bond was sealed with their common seal,* and subscribed by the defendants, who were two of the principal of the company. The bond was *noverint universi &c. Nos registrum and guardianos, &c.* of the company of Woodmongers, *teneri, &c. ;* and now, *the company being dissolved, action was brought against those who subscribed the bond,* but ruled that it could not lie, so the plaintiff was non-suit." (*Viner's Abr. Corporations p. 5.*)

It seems that in this case, two members of the corporation subscribed the bond ; and that the corporation sealed the bond.

The defendants did not plead *non est factum.* So I infer that they signed the bond as sureties. Indeed, I see no reason

Moultrie *et al. vs.* Smiley and Neal.

why they should have signed it at all, except it is that they might become bound; still, I may be mistaken in this. If so, the report of the case which is in *Lev.* 237—it being *Edmonds vs. Brown,* will probably correct me. That report is not within my reach.

Assuming that I am right—assuming that these defendants, by subscribing the bond, intended to bind themselves, then the case is directly in point, to show that the extinguishment of the debts which follows the dissolution of a corporation, is one which follows, whether there is any body left to sue or be sued for the debts or not; and also to show, that this extinguishment means the extinguishment of the debt—not a suspension of the debt—not an exoneration from the debt.

In relation to this last point, viz : whether the extinguishment of the debts consequent on a dissolution of a corporation, is not to be considered merely as a *discharge or exoneration* of the debtors from the debts, in the same way as the discharge of a bankrupt is a discharge or exoneration of him from his debts, I have a few more words to say.

It was not insisted in the argument of this case, that the extinguishment of corporation debts, on a dissolution of the corporation, is of the same nature as that of the discharge of a bankrupt on his bankruptcy, from his debts. It was, however, said to be of the same nature, by this Court, in the case of *Thornton vs. Lane,* as may be seen in the passage from that case which I have quoted. Hence, I think it my duty thus further, to notice the point.

In the first place, then, the language of the law which defines the consequences of bankruptcy to the debts of the bankrupt, is different from that which defines the consequences of dissolution to the debts of the corporation. The language for the former is, that the bankrupt shall be *discharged* from all debts due by him at the time he became a bankrupt—not that the debts shall be *extinguished.* On the contrary, there is another part of the same law which says that the debts are to get thier dividends of the bankrupt's estate, which they could not do if

they were things that had been extinguished. The language of the law, with respect to the consequences of dissolution, uniformly is, that the debts are *extinguished.*

But in the second place, the Bankrupt Acts, themselves, provide for keeping the bankrupt's debts, after his bankruptcy, alive against other persons liable for the same debts. "By the Statute 10 *Ann.* 15, the discharge of a bankrupt from his debt, shall not be construed to release any other person who was partner in trade, or jointly bound, or liable to the same debt with the bankrupt". (*Com. Dig. Bankrupt D.* 34.) This provision was carried into the new general Bankrupt Act of 6 *Ga.* 4, 16. (*Eden Bank. Law,* 396.)

In the Bankrupt Act of the United States, passed in 1841, a similar provision was inserted. It is in these words: "*Provided,* that no discharge of any bankrupt, under this Act, shall release or discharge any person who may be liable for the same debt as a partner, joint contractor, indorser, surety or otherwise, for or with the bankrupt". (*Sec.* 4.)

What is it, then, but these statutory provisions that prevents the mere *discharge* from his debt, of even *a bankrupt,* from operating as a discharge of all those bound with him or for him, to the payment of the same debt? But there are no such provisions of law to control the much stronger thing, *extinguishment* of the debt, consequent on the dissolution of a corporation. Must not that thing then have its full operation? I think it must.

My third reason for thinking that the true rule, as to extinguishment, does not take this form, viz: that the debts are extinguished only in case there is no one to sue or be sued for them is, that the only argument which I ever heard used in favor of the rule's taking that form, seems to me not to be well founded. That argument is, that on dissolution, the debts are extinguished, *because* then there is no one to sue or be sued for them. This, according to the argument, is the *reason* of the rule. What I have already said, shows, I think, this *not* to be the reason. In addition, I wish to hazard a word as to what *is* the reason.

This rule, as to extinguishment of the debts on dissolution, is 'but a *part* of the *general* rule which defines the whole consequences of dissolution. That general rule is stated by *Angell & Ames*, correctly no doubt, in these words: "At Common Law, upon the civil death of a corporation, all its real estate remaining unsold, reverts to the grantor and his heirs; for the reversion, in such an event, is a condition annexed by the law, inasmuch as the cause of the grant has failed. The personal estate in England vests in the King, and in our country in the people or State as succeeding to this right and prerogative of the Crown. The debts due to and from it, are totally extinguished; so that neither the members nor directors of the corporation can be charged with them in their natural capacities."

Now, it seems to me that the reason of the latter part of this rule is to be found in the existence of the two former parts. After these two parts of the rule had stripped the corporation of its whole property—had deprived it of its entire means of paying its debts, the best thing remaining to be done with the debts was to extinguish them; so that, as to him who owned them, they might not serve as a source of vain hope; and as to those whom he might suppose to owe them, the disjointed members of the dissolved corporation, they might not be turned into an instrument of useless harrassment and expense. And to extinguish them was best, even though there might be others bound as sureties for their payment. For in such case, the sureties, if made to pay them, would, themselves, become, by such payment, the holders of the same debts, and as much entitled to have the debts paid by the corporation, as the original creditors had been. And the original creditors and the sureties, thus become creditors, would be parties equally innocent— equally meritorious. There is no reason, therefore, why the sureties, rather than the original creditors, should be made the sufferers. There are some reasons why they should not be. More of evil would come of making them the sufferers than would of making the original creditors the sufferers. To make them the sufferers quiet things would have to be disturbed; there would have to be arrangements for getting the money to

pay the debts, &c.; the conveyance of the money, when got, to the creditors; the adjustment of the sums due; the writing of acquittances, &c.—trifles it is true, yet implying some degree of evil; the loss of some little time and labor; the incurring of some little expense; the undergoing of some degree of trouble and vexation. All this evil, such as it is, would be saved by making the original creditors, instead of the sureties, be the sufferers. In all other respects, the two classes would stand equal. The maxim, that of two innocent parties, one of whom must suffer *melior est conditio possidentis*, is not only law but wisdom.

This, as to the debts due *from* a corporation. As to those due *to* it this: By one of the two first parts of the general rule, the goods, that is the *choses in possession*, pass to the King. The debts due *to* the bank, if collected, would become *choses in possession*; and so, by that part of the rule, they would merely follow the course of the other goods and pass to the King. Why did not the rule, instead of extinguishing debts of this sort, require them to be collected and paid over to the King? Perhaps, for the reason that at the early time when the rule was a making, such debts were trifles not worth the King's pursuit, or perhaps as the question whom such debts should go to was a question of pure bounty, it was thought by the makers of the rule that the "poor debtor" is a more deserving object of bounty than the great King.

I hazard, then, the opinion, that the true reason why the law extinguished the debts due by a corporation on its dissolution was, that it had *itself first extinguished all the means* by which the debts could be paid: by giving back the corporation's real property to the person from whom it had come, and by transferring its personal property to the King.

Indeed, *could* the law-maker, when making this rule as to extinguishment have said, it is *necessary* to extinguish the debts *because* there is no one to be sued for them? For the law-maker must have known, that by the law as it stood, when he was making the rule, a debt is not necessarily extinguished, because there is no one to sue or be sued for it. When a man

·dies, there is no one, at first, to sue or be sued, as to *his* debts, yet the debts are not extinguished.   So, when a trustee dies or is removed from his trust; so when a debtor is without the jurisdiction.   Was it ever thought that inability to bring suit in these cases, was a reason which made it necessary to say the debts should be extinguished ?

Unless, therefore, the law-maker had had for making this rule of extinguishment some other reason than that which exists in these cases, viz : a mere want of some body to sue or be sued, would he have made the rule the rigid one of extinguishment, which it is ?   Would he not rather have made it one similar to that which exists in the case of the dissolution of a *natural* person, which is that the collection of the debts due to and from such person, shall be *suspended* until a *successor* can be appointed to take the place of the deceased person, but no longer ?   How easy for the law-maker to have said this, if his whole want was some body to sue and be sued.   But this he did not say.   What he said was, that on the dissolution of an *artificial* person, its debts should be extinguished—its property should *not* be administered for the benefit of creditors, but should go by the mere operation of law to others—the land to him from whom it had come—the goods to the King.

So much as to what is and what is not the reason of the rule.

The result of the whole inquiry, in my opinion is, to make the true meaning of the rule, that on the dissolution of a corporation its debts are extinguished this, that on such dissolution, the debts are *annihilated*—annihilated *absolutely*, not conditionally—not on condition that there is no one to sue or be sued for them.

If this be the true meaning of the rule, it follows that on the dissolution of this corporation, this debt was totally *annihilated*—annihilated, both as to the corporation and as to the directors.

And the practical result would be, that the plea of the directors ought to be considered a good bar.

Thus far I have treated the case as having but one aspect— that which presents the bank notes as constituting, each, only

one single debt; but that a debt due by *contract*, not by *tort*, and due by two separate parties—the bank and the directors— and the result at which I have arrived, has been, as above stated, the extinguishment of the notes, both as to the bank and directors. And this, it seems to me, is the only aspect which the case has.

Let us suppose, however, that it has another—an aspect of *tort*. Let us suppose, that though there is only a single debt due, but due from both the bank and the directors; yet, it is a debt founded on a *tort*. Let us suppose, if we can, that although the charter is a general contract, and the notes to be be paid are each particular contracts, and the liability of the directors is a liability growing exclusively out of the charter, and a liability to pay these notes; yet, notwithstanding all this liability, on the part of the directors, is a liability sounding in *tort*, and not in contract, whilst the liability, on the part of the bank itself—a liability growing out of the same charter—a liability to pay the same notes, is one sounding in contract and not in *tort*. If this be supposable, let us suppose it. Then the question will be, the bank and the directors being each liable for this one single *tort*, i. e. one *tort* for each bank note, does the extinguishment of that liability, as to the bank, extinguish it as to the directors? And I say it does.

" Also, if two men doe a trespasse to another, who releases to one of them, by his deed, all actions, personalls ; and notwithstanding, sueth an action of trespasse against the other, the defendant may well show that the trespasse was done by him and by another, his fellow, and that the plaintiff, by his deed, (which he sheweth forth) released to his fellow all actions, personalls, and demand the judgment," &c. This is the text of *Littleton*, and the commentary of *Coke* corresponds with the text. (*Coke. Litt.* 232, *a*.)

If a release of the right of action for a *tort*, given to one of two *tortfeasors*, releases the other, much more would an extinguishment of the debt or damages due for a *tort*, as to one of two *tortfeasors*, extinguish the debt or damages as to the other. Can there be a doubt of this?

Whether the debt of the directors, then, be one by *tort* or by contract, the effect is the same. The extinguishment of the debt, as to the bank, is the extinguishment of the debt, as to the directors.

Hitherto, I have gone on the supposition, that the bill-holder, in this case, had but one debt due to him on each of his bills, though it was due to him by each of two parties—the bank and the directors—and consequently, that he was entitled to but one payment. Say, however, that this supposition, so self-evidently true, as to me it appears to be, is yet untrue. Say that the bill-holder had the right to have payment of each of his bills twice—once from the bank and once from the directors. Say that the liability of the directors is distinct from and *independent* of the liability of the bank, so as to be totally unaffected by anything which affects the liability of the bank, then the question is, whether the liability of the directors, it being such as this, survives the expiration of the bank charter.

That being the question, *my* answer is, that the liability of the directors does *not* survive the expiration of the charter. And it is in the answer to this question, perhaps, that I differ most from the opinion of the majority of the Court; for they, if I understood them aright, put their judgment upon the idea, that by the charter, the liability of the directors was an "*independent* liability"; was one which would exist, even though the liability of the bank, itself, should cease to exist. They considered, that with respect to the liability of the *bank*, the liability had ceased, having become extinguished by the dissolution of the bank. Indeed, that this was so, was not considered an open question, it having been decided by the Court, after most thorough argument, in the case aforesaid, in 11 *Ga. R.* And that it was so, was not disputed by the Counsel for the bill-holder. The debt, then, as to the bank, having to be considered as extinguished, and yet, the majority of the Court still considering the directors liable to pay the amount of the debt, it was absolutely necessary, as it seems to me, for the Court, in order to have a foundation for this judgment to rest on, to hold the debt against the directors to be an *inde-*

*pendent* debt; that is to say, to hold, that before the dissolution of the bank, each of these bank notes was evidence of *two distinct, independent* debts—one against the bank, the other against the directors. If the notes were evidence, each, of but *one* debt, though that might be a debt against two parties, how could that debt, when extinguished—destroyed—annihilated, exist at all—exist against either of the parties; therefore, how could it exist against the directors? How could it exist against the directors, even should we assume the most unassumable of things, viz: that the directors were principals, and the bank but a surety? For if even a surety pays a a debt—if as to surety even a debt becomes *extinguished*, it is equally extinguished as to the principal. The *holder* cannot, then, call on the principal for payment, although, if the extinguishment be by *payment* of the debt, on the part of the surety, the surety may call on him for the payment of the *new* debt thus arising. Of course, if, as to the principal, the debt, by any means, becomes extinguished, much more is it true that the debt becomes extinguished, as to the surety. This all, however, I have already endeavored to show, and think I have shown.

If I have, then it follows, that when the majority of the Court hold the debt—hold *a debt* still to exist against the directors, they must hold that there had, before the dissolution of the bank, been existing for each bank note two debts, one against the bank, the other against the directors; and that of these two debts, it was only one which, by the dissolution of the bank, was extinguished, viz: that against the bank. This, to my mind, follows, of necessity.

For argument's sake, let it be admitted, therefore, that the bank notes constitute, each, evidence of two debts—one debt against the bank and another, and an "independent" debt against the directors, then did that one of the debts which was against the directors, expire with the expiration of the charter?

That one of the debts, *if it existed at all, existed by virtue of* the *charter.* This is clear.

If it existed at all, it existed too, as a *penalty.* The *directors*

got no benefit from issuing the bills. The consideration for the issuing of the bills went to the bank. But such bills—that is those thus issued in excess, being forbidden to be issued, and it having been put in the power of the directors to prevent their being issued, this liability to pay them, if issued, was imposed on the directors, as a *punishment* for not preventing the doing of that, the doing of which it was made their duty to prevent. That this debt was a *penalty*, therefore, it seems to me is equally clear.

The question, to my mind therefore is, will a penalty survive that which imposes it? Now although this penalty (as I call it, on the assumption I am now going on, of its being an independent debt,) clearly results from the charter and from nothing else; yet, it was considered by the majority of the Court, if I understood them aright, as resulting from a *law*, the charter being, in this respect, to be considered, in the opinion of the majority, not as a contract, but as a law.

Let the charter then be considered as a law. Then I think the question, whether a penalty will survive the law which imposes it, has been settled by this Court.

In the *Bank of St. Marys vs. The State,* (12 *Ga. R.* 496,) this Court say, "we fully and unanimously concur, then, in the following conclusions: that the authorities cited, abundantly sustain the position that an informer who *commences* suit under a Penal Statute, does not acquire thereby a *vested right*—that his claim to the penalty, at most, is *inchoate* only, and cannot be fixed or vested, except by judgment—that no judgment can be rendered on a repealed Statute—that the repeal of the Statute prevents the imperfect right from being consummated or from becoming a vested right or contract; and that it is perfectly within the legislative competency to pass such repealing Statutes before *final judgment*".

These "conclusions" more than cover this case. They are broad enough to cover it, had it, instead of being what it is, been such that the Legislature had *repealed* this eighth rule in the charter, *long before* the time of its expiration, provided the

repeal had been made, also, before these bill-holders had got actual judgment against the directors. And these "conclusions" rest upon a most solid foundation, as any one may see, who will be at the trouble to read the able opinion, of which they are the result.

They are recognized and affirmed in *Lyon vs. the State, in* 15th *Ga. R.* a case of the repeal of a law giving a right to the Solicitor General, &c. to have his costs out of penal bonds, &c. as far as one particular bond was concerned.

They have been recognized, in other cases, by this Court.

Is there any difference between the effect of the *expiration* of a law, and that of the repeal of the law? It was so argued, and two cases were cited to prove the argument. (8 *Mees. & Wels.* 234. 3 *Adolph. & Ell.* 690.) These cases, however, prove nothing of the sort. It is true, in these cases, the law in question had expired; and yet, the decisions were, that the rights given by the law, had not expired with the law. But the decisions were not put upon the ground, that there was a difference in the effects, between the *expiration* and the *repeal* of a law: but on the ground, that before the expiration of the law, the right given by the law had become a completely vested one. But according to the *Bank of St. Marys vs. The State*, a right to a *penalty*, never does become a completely vested one, before a judgment has been rendered for the penalty.

In the nature of the thing, it is impossible for any difference to exist between the effects of expiration and those of repeal.

By expiration, a law ceases to be; can repeal do more than make a law cease to be?

Thus, then, I have gone through with all the arguments which were presented to the Court, or which I can think of, to show that notwithstanding the expiration of this charter, the liability of the directors still remained; and the conclusion to which I have come is, that those arguments do not show it. On the contrary, on a careful survey of the whole ground, it seems to me most clear, that with the expiration of the charter, expired all liability, on the part of the directors.

Moultrie *et al. vs.* Smiley and Neal.

Indeed, I may say, that to my mind, nothing is left for argument when it is once admitted, that on the dissolution of a corporation, the debts which it owes are extinguished. For to say that the debt which is produced by the issuing of a bank bill, "in excess" is not a *single* debt, to the payment of which two parties are liable—the bank and the directors—but is a *double* debt, to the payment of one half of which, as an independent debt, one of those parties is liable and the other of them, to the payment of the other half, is a proposition which, I think, will not bear stating. It becomes necessary, therefore, to admit that the debt is a single debt; but a debt, to the payment of which two parties are liable. And to say that when a debt, to the payment of which two parties are liable, is extinguished as to one party, it is yet not extinguished as to the other, is to say what would, I think, make a revolution in the law of contracts. Would it not produce a revolution in that law, to say that payment by one of the parties liable to pay a debt, should not count for the other parties? And yet, what is payment but one out of many modes of extinguishing a debt? The very utmost that payment can do, is to extinguish the paid debt. And whatever else extinguishes the debt, does as much as payment can do. And this *extinguishment of the debt,* is the thing from which the consequences flow—the thing which, even in the case of payment, sets free the parties.

My conclusion, therefore, upon the whole is, that with the expiration of the charter, expired the liability of the directors to pay these bank bills. And for this conclusion, I have stated my reasons.

In the other case, that of *Moultrie vs. Neal,* which is like this, in all respects, I also dissent, and for the same reasons.